**2015-2069, -2070, -2071**

# United States Court of Appeals
# for the Federal Circuit

ARENDI S.A.R.L.,

*Appellant,*

*v.*

APPLE INC., GOOGLE INC., MOTOROLA MOBILITY LLC,

*Cross-Appellants.*

*Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2014-00206 and IPR2014-00207*

## BRIEF FOR APPELLANT ARENDI S.A.R.L.

BRUCE D. SUNSTEIN
ROBERT M. ASHER
SUNSTEIN KANN MURPHY & TIMBERS LLP
125 Summer Street
Boston, MA  02110-1618
(617) 443-9292
rasher@sunsteinlaw.com
bsunstein@sunsteinlaw.com
*Counsel for Appellant*
*Arendi S.A.R.L.*

NOVEMBER 24, 2015

COUNSEL PRESS, LLC                                                                 (888) 277-3259

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## Arendi S.A.R.L. v. Apple Inc.,

### No. 2015-2069, -2070, -2071

## CERTIFICATE OF INTEREST

Counsel for the Appellant, Arendi S.A.R.L., certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

   Arendi S.A.R.L.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Arendi S.A.R.L.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   Sunstein Kann Murphy & Timbers LLP,
   Bruce D. Sunstein, Robert M. Asher, D. Chiang

November 24, 2015                          /s/ BRUCE D. SUNSTEIN
                                           Counsel for Appellant

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF RELATED CASES UNDER FED. CIR. R. 47.5 .................. vii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF THE CASE .............................................................. 2

STATEMENT OF THE FACTS ........................................................... 3

    A.   The technology claimed in the subject patent ......................................... 3

    B.   The Petitions for *Inter Partes* Review and the Decisions to Institute.... 14

    C.   The Final Decisions of the *Inter Partes* Reviews ................................. 15

    D.   The Domini prior art reference .............................................................. 19

    E.   The Hachamovitch prior art reference .................................................... 23

SUMMARY OF THE ARGUMENT .................................................... 26

ARGUMENT ................................................................................ 27

I.   By interpreting an "application program" as an "independently
    executable" program that includes "dependent subsidiary programs",
    the Board adopted a construction that is both internally inconsistent
    and inconsistent with the intrinsic evidence of record.................................. 27

    A.   Standard of Review ............................................................................. 27

    B.   The Board erred by adopting a construction that is inconsistent
       with the specification, in violation of *Proxyconn* .................................. 28

    C.   The Board erred by construing "application program" in an
       internally inconsistent manner................................................................ 38

ii

II.  The Board erred by construing the "application program" to be an
     independently executable program and then inconsistently finding that
     Domini's spell checker program and Hachamovitch's word completion
     utility anticipate the claimed "application program" ..................................... 41

     A.  By construing "application program" to be an independently
         executable program, the Board adopted requirements that the prior
         art reference must meet to anticipate the limitation of the claim .......... 41

     B.  The Board erred in failing to determine whether Domini discloses
         an "independently executable program" in accordance with the
         Board's claim construction of "application program," and because
         the spell checker module in Domini functions at the behest of the
         word processing application, the Board erred in finding that
         Domini discloses an "application program" .......................................... 42

     C.  The Board erred in failing to determine whether Hachamovitch
         discloses an "independently executable program" in accordance
         with the Board's claim construction of "application program," and
         because the word completion utility of Hachamovitch functions at
         the behest of another application program, the Board erred in
         finding that Hachamovitch discloses an "application program" ............ 46

III. The Board erred by ignoring the intrinsic evidence of the claims
     themselves and interpreting the claim term "associated" not to require a
     pre-existing relationship ................................................................................. 49

     A.  Contrary to the requirements of *Permahedge* and *Phillips*, the
         Board failed to construe "associated" to account for the manner in
         which the term was recited throughout the claims ................................ 49

     B.  In failing to account for the claim 1 as a whole, the Board failed to
         recognize that the past tense of "associated" requires a relationship
         to have been determined prior to the "entering a first information"
         step, and thus requires a pre-existing relationship between first and
         second information from the second application program .................... 54

CONCLUSION ..................................................................................................... 58

ADDENDUM

     Final Written Decision for IPR2014-00206 ................................................. A-1

iii

Final Written Decision for IPR2014-00207 .............................................. A-70

U.S. Patent No. 7,496,854 B2 ................................................................ A-149

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Advanced Display Systems, Inc. v. Kent State University*,
  212 F.3d 1272 (Fed. Cir. 2000) ...........................................................28

*Am. Permahedge, Inc. v. Barcana, Inc.*,
   105 F.3d 1441 (Fed. Cir. 1997) .............................................. 49, 50, 51

*Autogiro Co. of America v. United States*,
  384 F.2d 391 (Ct. Claims 1967) ..........................................................29

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*,
  55 F.3d 615 (Fed. Cir. 1995) ...............................................................55

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) ................................................................................28

*In re Cortright*,
  165 F.3d 1353 (Fed. Cir. 1999) ...........................................................29

*In re Elsner*,
  381 F.3d 1125 (Fed. Cir. 2004) ...........................................................28

*In re Giannelli*,
  739 F.3d 1375 (Fed. Cir. 2014) ...........................................................28

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) ...........................................................29

*In re Suitco Surface, Inc.*,
  603 F.3d 1255 (Fed. Cir. 2010) ...........................................................29

*In Re Van Geuns*,
  988 F.2d 1181 (Fed. Cir. 1993) .................................................... 18, 30

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
  256 F.3d 1323 (Fed. Cir. 2001) .................................................... 50, 54

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
  383 F.3d 1295 (Fed. Cir. 2004) ............................................... 30, 37, 38

v

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996) ............................................................... 41, 43, 47

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) ................................................. 28, 29

*Moba, B.V. v. Diamond Automation, Inc.*,
  325 F.3d 1306 (Fed. Cir. 2003) ................................................... 8, 35

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ..................... 8, 28, 30, 35, 36, 37, 38, 49, 51, 55

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999) ................................................. 50, 55

*SciMed Life Systems, Inc. v. Advanced Cardiovascular Sys.*,
  242 F.3d 1337  (Fed. Cir. 2001) .......................................................36

*Snow v. Lake Shore & M.S. Ry. Co.*,
  121 U.S. 617, 7 S. Ct. 1343, 30 L. Ed. 1004 (1887) ..........................36

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*,
  574 U.S. —, 135 S. Ct. 831 (2015) ..................................................28

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ............................................. 29, 50, 54

## Statutes, Rules and Regulations

35 U.S.C. §112 ...................................................................................54

35 U.S.C. §141(a) ...............................................................................1

35 U.S.C. §142 .....................................................................................1

37 C.F.R. §90.3(a) ...............................................................................1

Fed. Cir. R. 15 .....................................................................................1

Fed. Cir. R. 52 .....................................................................................1

## STATEMENT OF RELATED CASES UNDER FED. CIR. R. 47.5

U.S. Patent No. 7,496,854 (the "'854 patent") and related patents are currently at issue in the following cases pending in the United States District Court for the District of Delaware.

|    | Case Name | Case No. |
|----|-----------|----------|
| 1  | Arendi S.A.R.L. v. Google Inc. | 1:2013cv00919 |
| 2  | Arendi S.A.R.L. v. Yahoo! Inc. | 1:2013cv00920 |
| 3  | Arendi S.A.R.L. v. HTC Corp., et al. | 1:2012cv01600 |
| 4  | Arendi S.A.R.L. v. Sony Mobile Communications (USA) Inc. | 1:2012cv01602 |
| 5  | Arendi S.A.R.L. v. Nokia Corporation, et al. | 1:2012cv01599 |
| 6  | Arendi S.A.R.L. v. Blackberry Limited, et al. | 1:2012cv01597 |
| 7  | Arendi S.A.R.L. v. LG Electronics Inc., et al. | 1:2012cv01595 |
| 8  | Arendi S.A.R.L. v. Motorola Mobility LLC | 1:2012cv01601 |
| 9  | Arendi S.A.R.L. v. Samsung Electronics Co. Ltd., et al. | 1:2012cv01598 |
| 10 | Arendi S.A.R.L. v. Apple Inc. | 1:2012cv01596 |

Notices of appeal to the United States Court of Appeals for the Federal Circuit ("Federal Circuit") have been filed and docketed for the following *inter partes* review decisions involving patents with subject matter related to the '854 patent:

|   | Case Name | Federal Circuit Docket No./ IPR Docket No. |
|---|---|---|
| 1 | Arendi S.A.R.L. v. Apple Inc. et al. | 15-2073 IPR 2014-00208 |
| 2 | Arendi S.A.R.L. v. Apple Inc. et al. | Not yet assigned IPR 2014-00452 |

Appeals are pending in the Federal Circuit for the following *ex parte* decisions of the Patent Trial and Appeal Board (the "Board") involving applications that have subject matter in common with the present patent:

|   | Application Serial No. | Board Docket No. | Federal Circuit Docket No. |
|---|---|---|---|
| 1 | 12/987,939 | 2012-008147 | 15-1893 |
| 2 | 13/449,086 | 2015-001447 | 16-1093 |

## JURISDICTIONAL STATEMENT

This court has jurisdiction under 35 U.S.C. §141(a), granting the right to appeal a final decision of the Board to the Federal Circuit. The present appeal is timely under 35 U.S.C. §142, 37 C.F.R. §90.3(a), and Fed. Cir. R. 15 and 52, since the Notice of Appeal was filed with the Director of the United States Patent & Trademark Office ("PTO") and the Federal Circuit on August 10, 2015, which is within 63 days after the date of the final Board decision on June 9, 2015.

## STATEMENT OF ISSUES

1.    By interpreting an "application program" as an "independently executable" program that includes "dependent subsidiary programs", did the Board err by adopting a construction that is both internally inconsistent and inconsistent with the intrinsic evidence of record?

2.    Did the Board err by construing the "application program" to be an independently executable program and then inconsistently finding that Domini's spell checker program and Hachamovitch's word completion utility anticipate the "application program" limitation?

3.    Did the Board err by construing the term "associated" not to require a pre-existing relationship?

## **STATEMENT OF THE CASE**

On December 2, 2013, Apple Inc., Google Inc., and Motorola Mobility LLC (collectively "Apple") filed two petitions for *inter partes* review against the '854 patent. The petition docketed as IPR 2014-00206 challenged claims 19-35, 57-85, 96, and 99 and the petition docketed as IPR 2014-00207 challenged claims 1-18, 36-56, 86-95, 97, 98, 100, and 101. On March 12, 2014, Arendi filed preliminary responses to the petitions, and on June 11, 2014, the Board instituted the *inter partes* reviews based on subsets of the grounds in Apple's petitions.

On June 9, 2015, the Board rendered a Decision in IPR 2014-00206 finding that claims 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96 were anticipated by U.S. Patent No. 6,085,206 to Domini ("Domini"). On the same day, the Board rendered a Decision in IPR 2014-00207 finding that claims 1-12 and 36-49 were unpatentable. In particular, the Board found claims 1, 2, 6–8, 12, 36, 37, 42–44, and 49 anticipated by Domini, claims 1–12 and 36–49 anticipated by U.S. Patent No. 6,377,965 to Hachamovitch ("Hachamovitch"), and claims 3–5, 9–11, 38–41, and 45–48 obvious over Hachamovitch.

## STATEMENT OF THE FACTS

### A.    The technology claimed in the subject patent

The technology of the '854 patent overcomes problems posed by the inability of two independently executable programs, such as word processing programs and information management programs, to interact with one another. At the time the '854 patent was filed, the lack of interaction between application programs complicated tasks that users wanted to perform, such as obtaining the address of an individual from a contact database and inserting it into a document. The Background section of the '854 patent explains that because "[t]ypically, the information is retrieved by the user from an information management source external to the word processor, …[t]his requires the user to learn how to use and have access to the database." See '854 patent, col. 1, lines 45-46, A-167.

For example, to insert an individual's address into a document, the limited capabilities of the prior art would require a user to (1) leave the window of the word processor displaying the document, (2) open the contact database, (3) search the contact database for the individual, (4) retrieve the additional contact information about the individual, (5) return to the word processor window displaying the document, and (6) insert the contact information into the document. Thus, for this task as well as others, users would have to perform unwieldly sequences of actions to accommodate the constraints of application programs.

3

By enabling independently executable programs to interact, as well as automating parts of this interaction, the technology of the '854 patent provides users with the benefit of remaining within a first independently executable program (like Microsoft WORD™) and accessing the functionality of a second independently executable program (like Microsoft OUTLOOK™), without having to open the second independently executable program. In fact, the user may access the functionality of the second program with a single execute command within the first program. As described in the following passage from the '854 patent:

> The above and other objects are achieved according to the present invention by providing a novel method, system and computer readable medium for providing a function item, such as a key, button, icon, or menu, tied to a user operation in a computer, whereby a single click on the function item in a window or program on a computer screen, or one single selection in a menu in a program, initiates retrieval of name and addresses and/or other person or company related information, *while the user works simultaneously in another program, e.g., a word processor*.

See '854 patent, col. 2, lines 14-23, A-167 (emphasis added). In contrast to the multiple steps that were previously required, Arendi's technology provides a significant simplification over the prior art.

As Arendi explained to the Board in its Response, in describing the problem being solved, the specification the '854 patent characterizes the nature of the programs in question. IPR 2014-00206 Response, 10-14, A-615 to A-619; IPR 2014-00207 Response, 11-15, A-943 to A-947. The Background section of the

'854 patent frames the problem as automating the interaction between a "word

processor" and a separate "information management" program, broad categories

that are also explained in the same passage:

> In recent years, with the advent of programs, such as word data from the database, data related to the typed data, e.g., the processors, spreadsheets, etc. (hereinafter called "word processors") users may require retrieval of information, such as name and address information, etc., for insertion into a document, such a letter, fax, etc., created with the word processor. Typically, the information is retrieved by the user from an information management source external to the word processor, such as a database program, contact management program, etc., or from the word processor itself, for insertion into the document. Examples of such word processors are WORD™, NOTEPAD™, EXCEL™, WORDPAD™, WORDPERFECT™, QUATROPRO™, AMIPRO™, etc., and examples of such information management sources are ACCESS™, OUTLOOK™, ORACLE™, DBASE™, RBASE™, CARDFILE™, etc.

See '854 patent, col. 1, lines 29-43, A-167. It can be seen from the above passage

that the '854 patent puts the prior art programs into two broad camps, "word

processors", a term including spreadsheet programs along with traditional word

processor programs, exemplified by WORD™, NOTEPAD™, EXCEL™,

WORDPAD™, WORDPERFECT™, QUATROPRO™, AMIPRO™, and

"information management" programs, exemplified by ACCESS™, OUTLOOK™,

ORACLE™, DBASE™, RBASE™, CARDFILE™. See also, to similar effect, the

Abstract of the '854 patent, A-149.

These broad word processor and database program categories are not only identified in the Background of the '854 patent, they are also defined in its Detailed Description:

> Although the present invention is defined in terms of word processing documents, such as WORD™ documents and EXCEL™ spreadsheets, the present invention is applicable to all types of word processing documents such as NOTEPAD™, WORDPAD™, WORDPERFECT™, QUATROPRO™, AMIPRO™.

'854 patent, col. 9, line 64-col. 10, line 3, A-171.

> Although the present invention is defined in terms of information management or is [sic] database programs, such as OUTLOOK™, etc., the present invention is applicable to all types of information management or database programs such as ACCESS™, ORACLE™, DBASE™, RBASE™, CARDFILE™, including "flat files," etc., as will be readily apparent to those skilled in the art.

'854 patent, col. 10, lines 4-10, A-171.

It is apparent to a person of ordinary skill in the art that these categories of programs defined by the specification of the '854 patent, the "word processor" and the "database program", and each of the programs listed in these categories, share the common feature of being "independently executable". Levy Decl., paragraph 43, A-675. Known characteristics of the programs indicate that they execute without having to be called by another program. For example, each of these programs can be invoked by double-clicking on an application program icon to initiate its execution in a separate process. *Id*. Each of these programs displays a separate and distinct window for managing user interaction. *Id*. Furthermore, each program runs asynchronously without being under the control of a separate

application program. *Id*. Therefore, the person of ordinary skill in the art would recognize that the programs' ability to be independently executable binds the programs together to be classified as "application programs". *Id*.

All of the programs listed in the '854 patent are independently executable for good reason. As explained above, the claimed technology of the '854 patent provides, within a first independently executable program (like Microsoft WORD™), a method of accessing the functionality of a second independently executable program (like Microsoft OUTLOOK™) without having to open the second independently executable program. Thus, the claimed technology replaces the six manual steps enumerated above for inserting an individual's address into a document with "a single click on the function item".

It is precisely because the word processing program and database are independently executable that a problem exists in accessing one of these programs within the confines of the other program. This problem is recognized and solved by '854 patent. If it were possible to access the database from within the word processor – that is, if the database program were not independently executable – there would be no need for the solution introduced by the '854 patent. That solution, as discussed above, enables accessing and using information stored in the database while remaining in a document open in the word processor. This ease of access provides a significant simplification over the prior art.

The '854 patent therefore lays out both (1) the problem posed by interaction between a first independently executable program, the word processor, and a second independently executable program, the database program, and (2) the solution to that problem achieved by automating the interaction so that it can be managed from within the word processor. This context in the '854 patent illuminates the meaning of its claims. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005), citing *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1315 (Fed. Cir. 2003) ("[T]he best indicator of claim meaning is its usage in context as understood by one of skill in the art at the time of invention.").

Moreover, the specification of the '854 patent provides seven detailed examples to demonstrate how embodiments of the claimed invention automate the interaction between the two independently executable application programs, the word processor and the database applications. Six of these examples recite Microsoft WORD™ for the word processing application while the remaining example recites Microsoft EXCEL™, and all of the examples recite Microsoft OUTLOOK™ for the information management program. IPR 2014-00206, Response, 12, A-617.

Figs. 3-5 depict the user interfaces for some of these examples, particularly the embodiments that begin with a word processing program, such as Microsoft

WORD™.[1] For example, when a user is viewing a document in Microsoft

WORD™ that includes a name, a user can enter an execute command to cause a

computer program to access a contact database to retrieve an address

corresponding to the name. See '854 patent, col. 5, line 63-col. 6, line 5, A-169.

To begin, Fig. 3 illustrates a document displaying a name:



FIG. 3

---

[1] See '854 patent, Figs. 3-5, col. 2, lines 51-61, A-155 to A-157, and A-167. In particular, Examples 1, 3, and 5 refer to Fig. 3 to illustrate the application from which the embodiments begin, whereas Examples 4 and 6 refer to Fig. 4 and Example 2 refers to Fig. 5. See '854 patent, col. 5, lines 63-65; col. 6, lines 11-13 and 45-47; col. 6, line 66-col. 7, line 1; col. 7, lines 30-32; col. 8, lines 14-16, A-169 and A-170. Similarly, Fig. 14 depicts the user interface for an embodiment that begins with a spreadsheet program, such as Microsoft EXCEL™. See '854 patent, Fig. 14, col. 3, lines 20-23, A-164 and A-168. Example 7 refers to Fig. 14 to illustrate the application from which the embodiments begin. See '854 patent, col. 8, lines 57-59, A-170.

When a user selects button 42, labeled "OneButton," a computer program recognizes that the document includes a name, searches for that name in a contact database, and finds an associated address. *Id*. Then, the computer program inserts the retrieved address into the document after the name. *Id*. After the computer program completes these tasks, the document appears as depicted in Fig. 4:



FIG. 4

In contrast to the prior art, as discussed above, the claimed technology allows the user to continue looking at the document in the word processing program while accessing information from the contact database. To obtain the same output using the prior art, a user would have to leave the word processor window, open the contact database, search the contact database for the individual, retrieve the additional contact information about the individual, return to the word

processor window displaying the document, and insert the contact information into the document.  Because the prior art processes require a plurality of actions by the user, in contrast to the single execute command required by Arendi's technology, the technology is a significant simplification over the prior art.

In the example just described, once the computer program finds a name in the document, the computer program then uses the name to cause a search in the contact database for an address. See '854 patent, col. 5, line 63-col. 6, line 5, A-169.  However, the computer program takes different actions depending on the type of contact information found.

These different paths are shown in logical flow diagrams in Figs. 1 and 2 of the '854 patent. See '854 patent, Figs. 1 and 2, A-153 and A-154. Fig. 1, reproduced below, shows various paths taken by the computer program in interacting with the two independently executable programs, depending on context:



FIG. 1

At step 2 in both figures, a user hits a button in a word processor. *Id*. As depicted in Fig. 1, in step 6, the computer program inquires about the type of data that the user typed, and depending on this type, the program proceeds to step 10, 12, or 14. See '854 patent, Fig. 1, A-153. As just discussed, in one scenario, if the computer program finds a name in the document, the computer program uses the name to cause a search in the contact database for an address (i.e., step 12 of Fig. 1). If the computer program finds just one address, the program will insert the address (i.e., step 22 of Fig. 1). In another scenario, the document may include a name and an address. In that situation, when a user selects the OneButton 42, the computer program recognizes that the document includes a name and an address (not just a

12

name), causes a search in the database for the name (i.e., step 14 of Fig. 1), and compares the address, in the contact database and associated with the name, against the address in the document. See '854 patent, col. 8, lines 14-21, A-170, and step 30 of Fig. 1. If the addresses conflict, the computer program may display the window illustrated in Fig. 9. See '854 patent, col. 8, lines 16-28, A-170.

Although different user inputs may trigger different paths of execution (e.g., steps 10, 12, or 14), for at least some of the paths, the program invokes the database in various scenarios (e.g., steps 12 and 14). *Id.*, see also '854 patent, col. 4, lines 43-46 and 57-58, A-168. In this manner, the examples in the specification and the figures depicting the flow of execution require two independently executable programs, namely the "word processor" and the "database program".

It is apparent that all of the examples in the specification of the'854 patent rely on applications that are independently executable, and nothing in the specification of the '854 patent suggests that the solution would cover programs with subsidiary relationships to other programs. On the contrary, as discussed above, the problems solved by the '854 patent arise precisely because the word processor and database programs are non-subsidiary and independently executable.

Accordingly, the specification makes clear that in the examples, the Summary, and the Background, the term "application program" means an independently executable program.

13

Claim 1, which is representative of the claims herein, reads as follows:

1.      A method for information handling within a document created using a first application program comprising the steps of:

entering a first information in the first application program;

marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

See '854 patent, col. 10, lines 41-51, A171.

Claim 3, which depends on claim 1, reads as follows:

3.      The method of claim 1, wherein the step of inserting the second information into the document further comprises the steps of:

initializing the second application program;

searching, using the second application program, for the second information associated with the first information; and

retrieving the second information.

*Id.*

## B.      The Petitions for *Inter Partes* Review and the Decisions to Institute

In IPR 2014-00206, Apple sought review of claims 19-35, 57-85, 96, and 99

in the '854 patent based on Domini, U.S. Patent No. 5,644,735 to Luciw

("Luciw"); James R. Miller & Thomas Bonura, *From Documents to Objects: An*

*Overview of LiveDoc*, SIGCHI BULLETIN, Vol. 30, No. 2, April 1998, pp. 53-58

("LiveDoc"); James R. Miller & Thomas Bonura, *Drop Zones: An Extension to LiveDoc*, SIGCHI BULLETIN, Vol. 30, No. 2, April 1998, pp. 59-63 ("Drop Zones"); U.S. Patent No. 5,946,647 to Miller, and U.S. Patent No. 5,963,964 to Nielsen, either alone or in combination. IPR 2014-00206 Petition, 13-14, A-193 to A-194. The Board instituted review of claims 19, 20, 22-26, 28-30, 57, 58, 60-74, 76-78, 85, and 96 of the '854 patent based on Domini and rejected the remaining grounds brought by Apple. IPR 2014-00206 Decision to Institute, 22, A-44.

In IPR 2014-00207, Apple sought review of claims 1-18, 36-56, 86-95, 97, 98, 100, and 101 in the '854 patent based on Domini, Hachamovitch, Luciw, LiveDoc, Drop Zones, and U.S. Patent No. 5,577,239 to Moore, either alone or in combination. IPR 2014-00207 Petition, 15-16, A-797 to A-798. The Board instituted review of claims 1-12, 36-38, 40-45, and 49 of the '854 patent based on Domini and review of claims 1-12 and 36-49 based on Hachamovitch, and rejected the remaining grounds brought by Apple. IPR 2014-00207 Decision to Institute, 24, A-114.

## C.    The Final Decisions of the *Inter Partes* Reviews

In its final decisions for IPR 2014-00206 and IPR 2014-00207, the Board reached its findings by failing to follow doctrines established by this Court.

In both IPRs, the Board unambiguously construes the limitation "application program" to be an independently executable program: "On the full record, we

determine that "application program" is construed as an independent executable program." [2] IPR 2014-00206 Final Decision, 12, A-12, and IPR 2014-00207 Final Decision, 11, A-80. Instead of analyzing whether the spell checker program of Domini is an independently executable program, in accordance with the Board's construction, the Board adjourns its analysis once it finds the words "application program" recited in the reference. IPR 2014-00206 Final Decision, 11, A-11 and IPR 2014-00207 Final Decision, 13, A-82. The Board latches onto Domini's mention of prior art "stand-alone" spell check program modules and Arendi's reference to the same:

> With respect to application programs in Domini, Patent Owner concedes that Domini discloses stand-alone spell checkers (PO Resp. 35-36 (citing Ex. 1007, 1:56-2:26; Ex. 2003 ¶ 24)), but argues that "a stand-alone spell checker would not be capable of inserting text into a word processor" (PO Resp. 36 (citing Ex. 2003 ¶¶ 24-25, 35)). We agree with Petitioner (Reply 11), however, that Domini discloses incorporating changes into a document by replacing words in the word processing document. Ex. 1007, 12:59-13:31, 14:42-67.[3]

IPR 2014-00206 Final Decision, 15, A-15 and IPR 2014-00207 Final Decision, 13-14, A-82 to A-83; see also, Domini, col. 1, lines 56-58, A-248. Because this

---

[2] As discussed below in footnote 7, the Board does not distinguish between "independent executable program" and "independently executable program".

[3] As discussed in part D below, the recited passages in Domini pertain, not to the prior art stand-alone spell checker, but rather to embodiments that are dependent, subsidiary programs.

finding of equivalence is cursory and insufficient, the Board failed to analyze

Domini for an "independently executable program."

Similarly, in IPR 2014-00207, instead of determining whether the word

completion program of Hachamovitch is an independently executable program, the

Board again largely adjourns its analysis once it finds the mere recitation of the

keywords "application-independent":

> Based on the record, we find that Petitioner has shown that
> Hachamovitch discloses that the word completion utility can be
> deployed as a "stand-alone" "application-independent" utility. Pet. 38
> (Ex. 1008, 7:65-8:5). Hachamovitch states that "[t]o deploy the word
> completion system as an application-independent utility, an interface
> is defined within each application program through which the word
> completion utility may communicate with each application program."
> Ex. 1008, 8:6-9. Although the utility described in Hachamovitch
> operates through the application program, the reference expressly
> states that the utility can be part of the application program or operates
> independent of the applications as a "stand-alone" utility. Ex. 1008,
> 7:65-8:5.

IPR 2014-00207 Final Decision, 18, A-87. As Arendi explained in its Response,

because the meaning of "application-independent" has nothing to do with how the

word completion system functions with respect to other programs, the Board

merely grasped the literal words to reach its finding. IPR 2014-00207 Response,

42-43, A-974 to A-975. Thus the Board failed to analyze Hachamovitch for an

"independently executable program".

Moreover, in applying Domini and Hachamovitch to the term "application

program", the Board improperly failed to consider the extrinsic evidence supplied

by Dr. Levy. Dr. Levy provided a thorough analysis of the operation of Domini in determining whether each spelling module disclosed in Domini is independently executable, yet the Board hardly addresses the merits of his declaration beyond perfunctory assertions that his arguments are unpersuasive. IPR 2014-00206 Final Decision, 11 and 14, A-11 and A-14, and IPR 2014-00207 Final Decision, 10 and 13, A-79 and A-82. Similarly, Dr. Levy testified that in Hachamovitch, a program that is "application-independent" has a standard interface and is a subsidiary program, but is not, by definition, independently executable. The Board similarly failed to address Dr. Levy's points on this matter.

Furthermore, instead of interpreting the claims in light of the specification, the Board intentionally shuns the specification as a basis for interpreting "application program":

> We disagree with Patent Owner's narrow interpretation. The term "application program" does not appear in the specification of the '854 patent. However, we are not persuaded that the term is limited by the commonly shared features of the examples in the '854 patent specification. *See Van Geuns*, 988 F.2d at 1184 ("[L]imitations are not to be read into the claims from the specification."). Patent Owner has not provided sufficient evidence to limit "application program" to programs that are not under the control of another program or run synchronously under the control of a separate application program (PO Resp. 13-14). … Construing application program as Patent Owner suggests improperly limits the claim term to the embodiments and examples in the '854 patent specification and imports negative limitations unsupported by the intrinsic evidence.

18

IPR 2014-00207 Decision, 10, A-79; similar language in IPR 2014-00206
Decision, 11, A-11. Only by disregarding the specification could the Board arrive
at a construction of "application program" that includes "dependent subsidiary
programs", which contradicts the teachings of the specification.

Lastly, the Board treats the limitation "application program" inconsistently
in its Decision. On the one hand, the Board properly interprets "application
program" as an "independently executable program".  On the other hand, the
Board declines to construe "application program" to "*exclude subsidiary programs*
based on characteristics of the example programs in the '854 patent specification".
IPR 2014-00206 Final Decision, 14, A-14 (emphasis added), and 12, A-14; see
also IPR 2014-00207 Final Decision, 14, A-83 and 11, A-80.

### D.    The Domini prior art reference

Domini is directed to a spell checking module that operates within a word
processing application or in a distributed computing environment. See, Domini,
Abstract, col. 3, lines 1-12, col. 5, lines 1-8 and 17-27, A-241, A-249, and A-250.
Of record in the proceeding is a thorough analysis by Dr. Levy, in paragraphs 20-
22 of his Declaration, of the operation of Domini as to whether the modules there
are independently executable:

> 20. With this distinction as background, I now turn to discussion of
> the operation of Domini's system. Figures 5, 6 and 7 of Domini show
> the operation of the grammar checker and the spell checker program

modules in the Domini system. Figure 6 portrays the details of box 510 (Extract Sentence from Document) of Fig. 5. The four steps of Fig. 6 show that an application program (the word processing program) calls the grammar checker to extract a sentence from a text buffer. Because Fig. 6 shows "call grammar checker" 605 as the first step and "receive sentence indices from grammar checker" 620 as the fourth and last step of "extract sentence from document" 510, we know that the calling program (the word processor) waits for the completion of step 620 before continuing with step 515 "spell check sentence". Similarly, "spell check sentence" 515 is elaborated in Fig. 7 with steps 705 through 750. The sequence begins with "call spell checker" 705 followed by "send word to spell checker" 710. Step 715, "verify accuracy of word" is then performed by the spell checker, followed by step 720, "send spelling data to application." This makes it clear that the calling program (the word processor) waits for the results of the spell checking operation. The steps for spell checking are performed iteratively for each word in the sentence until the test "another word?" 750 results in a "no" and the application program continues to step 517. In addition, if any word is found in step 725 "word satisfactory?" to be not satisfactory, the application program receives from the spell checker error type information at step 730 and suggestions at step 735. The application program waited for this information from the spell checker because it cannot proceed without it. The application program receives error type and suggestion information from the spell checker, and then interacts with the user in steps 740 "display combined dialogue" and 745 "receive command input from user." Like the application program to grammar checker interactions described above, *these interactions are synchronous, because the application program cannot proceed until a response is received from the user input/output subsystem*. These steps 740 and 745 are performed by the application program (the word processor), not by the spell checker. The spell checker provides text for the application program to use in displaying options to the user and later for inserting into the open document. However, the application program itself performs the insertion, based on the text supplied by the spell checker.

21. The Specification of Domini explains how the word processor application receives information from the spell checker program module:

At step 730, the preferred application program module consults a structure called a Spell Check Return Status field in a Spell Return Buffer (SRB) to determine the type of spelling error. When the CSAPI function SpellCheck is called, the spell checker program module returns the SRB. The SRB includes a field called a Spell Check Return Status (SCRS). The SCRS is an integer code that the application program module consults to determine the error type information. The error type information indicates the type of spelling error detected by the spell checker program module.

(Domini Col. 17 ll. 58-67)

Based on this description together with Fig. 7 and the sequence of operations explained above in ¶20, a person of ordinary skill in the art would understand that, in the Domini system, all interactions between the word processor and the spell checker program module are synchronous communications. Similarly, as detailed in Figs. 6 and 8 of Domini, sentence-breaking and grammar checking are also performed using synchronous communications between the word processor and the grammar checker program module.

22. A functionality that is key to the operation of the Domini spell checker utility and to the Hachamovitch word completion utility is the ability to cause insertion of text into a document that is concurrently being operated on by a word processor application program. This functionality enables the Domini spell checker program module, operating in conjunction with the word processor application, to insert a correctly spelled word into the document. This functionality similarly enables the Hachamovitch word completion program module (in cooperation with the application program, as described above) to insert into a word processor document, text that is associated with a user-definable pattern of keystrokes. Because in each case this insertion functionality sheds light on the nature of operation of the utility, I discuss the insertion functionality in relation to the manner of operation of the Domini and Hachamovitch program modules.

Levy Decl., paragraphs 20-22, A-660 to A-663 (emphasis added); see also IPR

2014-00206 Response, 25-31, A-630 to A-636, and IPR 2014-00207 Response, 30-

37, A-962 to A-969.

Despite Dr. Levy's extensive explanation, the Board failed to consider this

evidence. Further, Dr. Levy points out that the stand-alone products discussed as

prior art in Domini, which were independently executable, are inapplicable to

Arendi's claims because they could not insert into a document open in a word

processor, and moreover, Domini contrasted the stand-alone products with the

subsidiary programs described after the Background section:

> 24. A person of ordinary skill in the art would understand that a
> "standalone spell checker" was an independently executable computer
> program that does not interact with a word processor program in order
> to perform its spell checking function. Such a spell checker, being
> independently executable, would generate and output its own user
> display and receive inputs directly from the user. The separate user
> interfaces of such programs is cited by Domini as a disadvantage of
> performing spell checking using a "stand-alone" spell checker. (See
> Domini '206, Col. 1 l. 56 – Col. 2 l. 26). The standalone spell checker
> would also receive input from and perform output to a text file
> without reference to a word processor program.

> 25. Thus, such a standalone spell checker program module would not
> be capable of inserting a correctly spelled word into a document
> concurrently being viewed and operated on in a word processor
> application program, because it would not have access to the word
> processor application's document. In consequence of this fact, Domini
> does not teach or suggest how a standalone spell checker would
> achieve insertion of a word into a document within a word processor.

> 26. Domini states in the background that as spell checkers developed,
> they were integrated into the word processor. A person of ordinary

> skill in the art would understand "integrated" to mean that the spell checker operated within the process of the word processor and synchronously with the word processor in order to achieve insertion. Even in the postulated case of a spell checker executing in another processor connected by a network to the processor executing the word processor, such a spell checker would nonetheless be invoked using synchronous communications and therefore would still be a subsidiary program activated by calls from the word processor.

Levy Decl., paragraphs 24-26, A-664 to A-665; see also IPR 2014-00206 Response, 16-17, A-634 to A-635, and IPR 2014-00207 Response, 35-36, A-967 to A-968. Although the Board attempts to counter Dr. Levy's point that "Domini does not teach or suggest how a standalone spell checker would achieve insertion of a word into a document within a word processor", the Board references passages in Domini that relate, *not to the stand-alone spell checkers described in the Background section*, but rather to the subsidiary modules discussed in the Detailed Description.

## E.    The Hachamovitch prior art reference

Hachamovitch describes a word completion utility that is used in conjunction either with an individual application program or with a group of different application programs, i.e. "application-independent". See IPR 2014-00207 Response, 24, A-956, referencing Hachamovitch, col. 4, lines 10-28, A-851. Arendi had provided Dr. Levy's testimony, not addressed by the Board, that when a program is "application-independent", such a program has a standard interface and is a subsidiary program, not one that is independently executable:

23

30. Hachamovitch mentions that the word completion utility may be an "application independent" utility.

> … [T]he word completion system may be deployed within an operating system or as a stand-alone utility that may operate on an application-independent basis. Application independence is the ability of the same word completion system to work with several different application programs, such as a word processing program, an e-mail program, a spreadsheet program, a personal calendar program, and so forth.

(Hachamovitch '965 Col. 7 l. 65 - Col. 8 l. 5)

A person of ordinary skill in the art would understand that "application independent" in this paragraph of Hachamovitch refers to the utility having a standard interface (as in Domini's CSAPI and CGAPI) that can be used by any one of multiple application programs and being capable of running within and synchronously with any one of a plurality of application programs. A person of ordinary skill in the art would understand that "application independent" in this paragraph of Hachamovitch refers to the utility having a standard interface (as in Domini's CSAPI and CGAPI) that can be used by any one of multiple application programs and being capable of running within and synchronously with any one of a plurality of application programs.

31. Hachamovitch states that an interface exists within each application program that operates with the Hachamovitch utility:

> To deploy the word completion system as an application-independent utility, an interface is defined within each application program through which the word completion utility may communicate with each application program. This allows the word completion utility to monitor the entry of characters into the application program user interface, to determine the location within the user interface to display the word completion frame, and to determine when the user had invoked the word completion user interface. The only potential drawback of an application-independent deployment may be a

slight reduction in the speed at which the word
completion system performs its operations.

(Hachamovitch '965 Col. 8, ll. 6-17)

A person of ordinary skill in the art would understand from reading
this description and from reviewing Hachamovitch Fig. 5 that the
word completion utility inspects each keystroke input by the user to
the active file of the word processing or other application program.
(See "Receive a character into the current file" 503.) A person of
ordinary skill in the art would also understand that the word
completion utility outputs suggestions into a defined text box on the
user's screen. (See, e.g., Fig. 2A, box 208; Fig. 2B, box 208'; Fig. 2C,
box 208''. See also Fig. 5, "Display completion in the word
completion field" 514.)

32. In the paragraph referring to the utility as an "application
independent" utility, (Col. 7 l. 66 - Col. 8 l. 5) Hachamovitch does not
explain how insertion would be achieved if the utility and the
application program were not tightly integrated and cooperative, and
therefore a person of ordinary skill in the art would conclude that the
utility operates synchronously and cooperatively as part of the
application program to manage text in the application program's text
buffer as taught by the main embodiment.

Levy Decl., paragraphs 30-32, A-668 to A-670. Dr. Levy explained previously that

a utility operating synchronously and cooperatively as part of an application

program is a subsidiary program that is not independently executable. Levy Decl.,

paragraphs 17-18, A-658 to A-659. These points were further referenced in

Arendi's Response. See, IPR 2014-00207 Response, 42-44, A-974 to A-976.

Although Hachamovitch characterizes the word completion utility as

"application-independent", it is independent only insomuch as it is not required to

execute within or in response to any *particular* application. IPR 2014-00207

Response, 42, A-974. Put another way, the "application independence" of the word completion utility refers only to its ability to interact with any given application, even though the utility cannot be invoked except by the given application. As explained by Dr. Levy, the "application independent" utility of Hachamovitch is dependent on the application program:

> 32. In the paragraph referring to the utility as an "application independent" utility, (Col. 7 l. 66 - Col. 8 l. 5) Hachamovitch does not explain how insertion would be achieved if the utility and the application program were not tightly integrated and cooperative, and therefore a person of ordinary skill in the art would conclude that the utility operates synchronously and cooperatively as part of the application program to manage text in the application program's text buffer as taught by the main embodiment.

Levy Decl., paragraph 32, A-668 to A-669.

The evidence of record, therefore, establishes that the "application-independent" utility of Hachamovitch is a subsidiary program, not an independently executable one.

## <u>SUMMARY OF THE ARGUMENT</u>

The Board's conclusions of unpatentability of the claims of the '854 patent based on Domini and Hachamovitch are built on the flawed premise that the term "application program" can include "dependent subsidiary programs". By interpreting an "application program" as an "independently executable" program that includes "dependent subsidiary programs", the Board adopted a construction

26

that is internally inconsistent. It is also inconsistent with the intrinsic evidence of record.

Moreover, the Board erred in failing to determine, in accordance with its own claim construction of "application program," whether Domini and Hachamovitch disclose an "independently executable program". The Board also erred in determining that Domini and Hachamovitch disclose an "independently executable program".

Finally, the Board erred by disregarding the instrinsic evidence and interpreting the term "associated" not to require a pre-existing relationship. Therefore, the Court should reverse the Board's determinations of unpatentability based on Domini and Hachamovitch.

## ARGUMENT

I. **By interpreting an "application program" as an "independently executable" program that includes "dependent subsidiary programs", the Board adopted a construction that is both internally inconsistent and inconsistent with the intrinsic evidence of record**

### A.    Standard of Review

The Board's conclusions of unpatentability of the claims of the '854 patent based on Domini and Hachamovitch are built on the flawed premise that the term "application program" used in the claims can include "dependent subsidiary programs".  The Board reached these conclusions even though the whole purpose of the '854 patent is to provide, within a first independently executable program

(like Microsoft WORD™), a method of accessing the functionality of a second independently executable program (like Microsoft OUTLOOK™) without having to open the second independently executable program.

The Board's findings of obviousness are a question of law, based on underlying factual findings. *In re Giannelli*, 739 F.3d 1375, 1379 (Fed. Cir. 2014), citing *Graham v. John Deere Co.,* 383 U.S. 1, 17-18 (1966) and *In re Elsner,* 381 F.3d 1125,1127 (Fed. Cir. 2004). Anticipation is a question of fact. *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1281 (Fed. Cir. 2000). The Board's legal conclusions are reviewed *de novo* by the Federal Circuit; the Board's factual findings, including those underlying legal determinations, are reviewed for substantial evidence when based on extrinsic evidence and, when based on intrinsic evidence, they are reviewed *de novo. Cf. Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc*., 574 U.S. —, 135 S. Ct. 831, 841-42 (2015) (review of claim construction on appeal); *Microsoft Corp. v. Proxyconn, Inc*., 789 F.3d 1292, 1297 (Fed. Cir. 2015) (*Teva v. Sandoz* followed for claim construction).

### B.     The Board erred by adopting a construction that is inconsistent with the specification, in violation of *Proxyconn*

This Court has long held that patent claims must be interpreted in a manner that is consistent with the specification. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005), citing, among other cases, *Vitronics Corp. v. Conceptronic,*

*Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) and *Autogiro Co. of America v. United States,* 384 F.2d 391, 397-98 (Ct. Claims 1967). During an *inter partes* review, the Board must interpret claims according to their "broadest reasonable interpretation", but this standard does not grant the Board unrestricted latitude for claim construction. *In re Suitco Surface, Inc.,* 603 F.3d 1255, 1260 (Fed. Cir. 2010) ("The broadest construction rubric coupled with the term "comprising" does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the claimed invention....[rather,] claims should always be read in light of the specification and teachings in the underlying patent."). The Board's construction "cannot be divorced from the specification and the record evidence", and the claims must be "consistent with the one that those skilled in the art would reach." *Microsoft Corp. v. Proxyconn, Inc*., 789 F.3d 1292, 1297-1298 (Fed. Cir. 2015), citing *In re NTP, Inc.,* 654 F.3d 1279, 1288 (Fed. Cir. 2011) and *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999).

In its final decisions for IPR 2014-00206 and IPR 2014-00207, the Board stepped over the line defined by this Court in *Proxyconn* and prior cases by intentionally shunning the specification as a basis for interpreting "application program":

> We disagree with Patent Owner's narrow interpretation. The term "application program" does not appear in the specification of the '854 patent. However, we are not persuaded that the term is limited by the commonly shared features of the examples in the '854 patent

29

specification. *See Van Geuns*, 988 F.2d at 1184 ("[L]imitations are not to be read into the claims from the specification."). Patent Owner has not provided sufficient evidence to limit "application program" to programs that are not under the control of another program or run synchronously under the control of a separate application program (PO Resp. 13-14). … Construing application program as Patent Owner suggests improperly limits the claim term to the embodiments and examples in the '854 patent specification and imports negative limitations unsupported by the intrinsic evidence.

IPR 2014-00207 Decision, 10, A-79; similar language in IPR 2014-00206

Decision, 11, A-11.

Even though the specification does not explicitly define "application

program", its meaning can nevertheless be discerned from the Background section

of the patent and the examples that the specification provides. *Phillips,* 415 F.3d at

1321, citing *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300

(Fed. Cir. 2004) ("Even when guidance is not provided in explicit definitional

format, the specification may define claim terms by implication such that the

meaning may be found in or ascertained by a reading of the patent documents.")

By extending the term "application program" to include "dependent subsidiary

programs", the Board adopted a construction that inappropriately contradicts the

teachings of the specification.

As Arendi explained to the Board in its Response, in describing the problem

being solved, the specification characterizes the nature of the programs in question.

IPR 2014-00206 Response, 10-14, A-615 to A-619; IPR 2014-00207 Response,

11-15, A-943 to A-947. The Background section of the specification frames the

problem as automating the interaction between a "word processor" and a separate

"information management" program, broad categories that are also explained in the

same passage:

> In recent years, with the advent of programs, such as word data from
> the database, data related to the typed data, e.g., the processors,
> spreadsheets, etc. (hereinafter called "word processors") users may
> require retrieval of information, such as name and address
> information, etc., for insertion into a document, such a letter, fax, etc.,
> created with the word processor. Typically, the information is
> retrieved by the user from an information management source external
> to the word processor, such as a database program, contact
> management program, etc., or from the word processor itself, for
> insertion into the document. Examples of such word processors are
> WORD™, NOTEPAD™, EXCEL™, WORDPAD™,
> WORDPERFECT™, QUATROPRO™, AMIPRO™, etc., and
> examples of such information management sources are ACCESS™,
> OUTLOOK™, ORACLE™, DBASE™, RBASE™, CARDFILE™,
> etc.

See '854 patent, col. 1, lines 29-43, A-167. As the Background explains about the

prior art, because "[t]ypically, the information is retrieved by the user from an

information management source external to the word processor, …[t]his requires

the user to learn how to use and have access to the database." See '854 patent, col.

1, lines 45-46, A-167. Moreover, it can be seen from the above passage that the

'854 patent puts the prior art programs into two broad camps, "word processors", a

term including spreadsheet programs along with traditional word processor

programs, exemplified by WORD™, NOTEPAD™, EXCEL™, WORDPAD™,

31

WORDPERFECT™, QUATROPRO™, AMIPRO™, and "information

management" programs, exemplified by ACCESS™, OUTLOOK™, ORACLE™,

DBASE™, RBASE™, CARDFILE™.

     In contrast to the prior art, the claimed technology allows the user to

continue looking at a document in the word processor while accessing and using

information from the database:

> The above and other objects are achieved according to the present
> invention by providing a novel method, system and computer readable
> medium for providing a function item, such as a key, button, icon, or
> menu, tied to a user operation in a computer, whereby a single click
> on the function item in a window or program on a computer screen, or
> one single selection in a menu in a program, initiates retrieval of name
> and addresses and/or other person or company related information,
> *while the user works simultaneously in another program, e.g., a word*
> *processor.*

See '854 patent, col. 2, lines 14-23, A-167 (emphasis added).

     The above passage makes clear that the subject matter of the '854 patent is

the automation of the interaction between a first program, the word processor, and

a second program handling the database. See also, to similar effect, the Abstract of

the '854 patent, A-149. These broad word processor and database program

categories are not only identified in the Background section of the '854 patent,

they are also defined in its Detailed Description:

> Although the present invention is defined in terms of word processing
> documents, such as WORD™ documents and EXCEL™
> spreadsheets, the present invention is applicable to all types of word

32

> processing documents such as NOTEPAD™, WORDPAD™, WORDPERFECT™, QUATROPRO™, AMIPRO™.

'854 patent, col. 9, line 64-col. 10, line 3, A-171.

> Although the present invention is defined in terms of information management or is [sic] database programs, such as OUTLOOK™, etc., the present invention is applicable to all types of information management or database programs such as ACCESS™, ORACLE™, DBASE™, RBASE™, CARDFILE™, including "flat files," etc., as will be readily apparent to those skilled in the art.

'854 patent, col. 10, lines 4-10, A-171.

It is apparent to a person of ordinary skill in the art that these categories of programs defined by the specification of the '854 patent, the "word processor" and the "database program", and each of the programs listed in these categories, share the common feature of being "independently executable". Levy Decl., paragraph 43, A-675. Known characteristics of the programs indicate that they execute without having to be called by another program. For example, each of these programs can be invoked by double-clicking on an application program icon to initiate its execution in a separate process. *Id.* Each of these programs displays a separate and distinct window for managing user interaction. *Id.* Furthermore, each program runs asynchronously without being under the control of a separate application program. *Id.* Therefore, the person of ordinary skill in the art would recognize that the programs' ability to be independently executable binds the programs together to be classified as "application programs". *Id.*

33

All of the programs listed in the '854 patent are independently executable for good reason. After all, as explained above, the claimed technology of the '854 patent provides, within a first independently executable program (like Microsoft WORD™), a method of accessing the functionality of a second independently executable program (like Microsoft OUTLOOK™) without having to open the second independently executable program. Because the word processing program and database execute independently of one another, to obtain the same output using the prior art, a user would have to leave the document displayed in the word processor, open the database application, search the database for the first information, retrieve the associated second information from the database, return to the document displayed in the word processor, and insert the second information into the document.

It is precisely because the word processing program and database are independently executable that a problem exists in accessing one of these programs within the confines of the other program. This problem is recognized and solved by '854 patent. If it were possible to access the database from within the word processor – that is, if the database program were subsidiary and not independently executable – there would be no need for the solution introduced by the '854 patent. That solution, as discussed above, enables accessing and using information stored

in the database while remaining in a document open in the word processor. This ease of access provides a significant simplification over the prior art.[4]

The '854 patent therefore lays out both (1) the problem posed by interaction between a first independently executable program, the word processor, and a second independently executable program, the database program, and (2) the solution to that problem achieved by automating the interaction so that it can be managed from within the word processor. This context in the '854 patent illuminates the meaning of its claims. *Phillips,* 415 F.3d at 1315, citing *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1315 (Fed. Cir. 2003) ("[T]he best indicator of claim meaning is its usage in context as understood by one of skill in the art at the time of invention.").

As discussed in detail above in the Statement of Facts, the specification of the '854 patent provides seven detailed examples to demonstrate how embodiments of the claimed invention automate the interaction between the two independently executable application programs, the word processor and the database applications.

_____

[4] The dependent subsidiary programs of Domini (for spell checking) and Hachamovitch (for word completion), which form part of the prior art and are discussed in section II below, stand in marked contrast to the independently executable programs discussed in the '854 patent. The functionality of Domini's spell checker and of Hachamovitch's word completion facility can be accessed directly within the word processing program, and indeed they *must* be, since their sole purpose is to support the word processing program. It is precisely because these functionalities can and must be accessed within the word processor program that they are called "dependent" or "subsidiary programs". See Levy Decl., paragraph 44, A-675.

Six of these examples recite Microsoft WORD™ for the word processing

application while the remaining example recites Microsoft EXCEL™, and all of

the examples recite Microsoft OUTLOOK™ for the information management

program. IPR 2014-00206 Response, 12, A-617.

Contrary to the Board's contention that the examples from the specification

would improperly limit the term "application program",[5] this Court has recognized

that the manner in which the specification describes examples reveals the extent to

which the examples are meant to restrict the claims:

> One of the best ways to teach a person of ordinary skill in the art how
> to make and use the invention is to provide an example of how to
> practice the invention in a particular case. Much of the time, *upon
> reading the specification in that context, it will become clear whether
> the patentee is setting out specific examples of the invention to
> accomplish those goals, or whether the patentee instead intends for
> the claims and the embodiments in the specification to be strictly
> coextensive.* See *SciMed Life Sys.*, 242 F.3d at 1341. *The manner in
> which the patentee uses a term within the specification and claims
> usually will make the distinction apparent.* See *Snow v. Lake Shore &
> M.S. Ry. Co.*, 121 U.S. 617, 630, 7 S. Ct. 1343, 30 L. Ed. 1004 (1887)
> (it was clear from the specification that there was "nothing in the
> context to indicate that the patentee contemplated any alternative"
> embodiment to the one presented).

*Phillips,* 415 F.3d at 1323 (emphasis added).

It is apparent that all of the examples in the specification of the'854 patent

rely on applications that are independently executable, and nothing in the

---

[5] IPR 2014-00206 Final Decision, 10, A-10, and IPR 2014-00207 Final Decision,
9, A-78.

specification of the the'854 patent suggests that the solution would cover programs with subsidiary relationships to other programs. On the contrary, as discussed above, the problems solved by the '854 patent arose precisely because the word processor and database programs are independently executable. Accordingly, the specification makes clear that in the examples, the Summary, and the Background section, the term "application program" means an independently executable program. By adopting a construction of "application program" that includes "dependent subsidiary programs", the Board erred by construing the term in a manner that is contrary to the teachings of the specification of the'854 patent.

The Board's sweeping statements, quoted above in further detail, by which it justifies shunning the specification as a tool for understanding the term "application program", contradict doctrines laid down by this Court and the evidence of record:

> Construing application program as Patent Owner suggests improperly limits the claim term to the embodiments and examples in the '854 patent specification and imports negative limitations unsupported by the intrinsic evidence.

IPR 2014-00207 Decision, 10, A-79; similar language in IPR 2014-00206 Decision, 11, A-11.

As we have demonstrated, contrary to the Board's allegations, an explicit definition of a term need not appear in the specification for the specification to guide its interpretation. *Phillips, supra*, 415 F.3d at 1321, citing *Irdeto Access, Inc.*

37

*v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004). Furthermore, when the specification indicates how its examples impact the scope of the claims, interpretation of the claims in light of the specification is not an improper importation of the disclosed embodiments into the claims. *Phillips, supra*, 415 F.3d at 1323. Finally, despite the Board's allegation that Arendi's proposed construction is "unsupported by the intrinsic evidence", Arendi has, in fact, marshalled copious intrinsic evidence for its position, and supplemented that intrinsic evidence with extrinsic evidence provided by Dr. Levy.[6]

Because the Board ignored the specification when determining its construction of "application program", the Board erred by interpreting the term in a manner that is inconsistent with the specification. Arendi respectfully requests that this Court reverse the final Decisions of the Board.

### C.    The Board erred by construing "application program" in an internally inconsistent manner

In addition to ignoring the specification of the '854 patent in its construction of "application program", the Board treats the limitation inconsistently in its

---

[6] The Board similarly dismissed the evidence of Dr. Levy's testimony: "We do not find Dr. Levy's testimony persuasive that the broadest reasonable interpretation of "application program" by one of ordinary skill in the art at the time of the invention is defined by "commonly shared features" of examples of computer programs in the patent specification. *See* PO Resp. 11-16 (citing Ex. 2003 ¶¶ 42-44)." IPR 2014-00207 Decision, 10, A-79; similar language in IPR 2014-00206 Decision, 11, A-11.

Decision. On the one hand, the Board properly interprets "application program" as an "independently executable program".[7] On the other hand, the Board declines to construe "application program" to "*exclude subsidiary programs* based on characteristics of the example programs in the '854 patent specification." IPR 2014-00206 Final Decision, 14, A-14 (emphasis added) and 12, A-12; see also IPR 2014-00207 Final Decision, 14, A-83 and 11, A-80.

The Board's construction for "application program" as an "independently executable program" cannot consistently include a program having a characteristic that directly contradicts that construction. The Board's construction of "application program" renders the term meaningless. A "subsidiary program" by definition is not an independently executable program. As Arendi previously submitted in IPR 2014-00207 Exhibit 2002, the American Heritage College dictionary, 3rd edition, provides the following exemplary definitions of "independent":

> 1. Not governed by a foreign power; self-governing. 2. Free from the influence, guidance, or control of another or others; self-reliant. 3. Not determined or influenced by someone or something else; not contingent.

---

[7] IPR 2014-00206 Final Decision, 10, A-10; see also IPR 2014-00207 Final Decision, 9, A-78. The Board refers to "independent executable program", omitting the –ly in "independently" and then says that it treats Arendi's contentions as if they apply to both "independent executable program" and "independently executable program". *Id.* Because the Board does not distinguish between these terms, this brief refers to "independently executable program".

See IPR 2014-00207 Exhibit 2002, A-984.[8] One of ordinary skill would appreciate that a subsidiary program would be (1) governed by another program, (2) subject to the influence, guidance, or control of another program, (3) contingent upon the behavior of another program, or all of the above. Instead of being an "independently executable program", a subsidiary program would necessarily depend on another program for its execution. Levy Decl., paragraph 44, A-675 ("subsidiary programs are not independently executable").

The Board's construction of "application program" as including subsidiary programs (which we have shown are not independently executable) allowed the Board to determine, erroneously, that Domini and Hachamovitch disclose an "application program". We show in Section II below that the subsidiary programs of those references are not independently executable and therefore are not "application programs" within the meaning of the claims in the '854 patent.

Because the Board erred by improperly construing the term "application program" in an internally inconsistent manner, Arendi respectfully requests that this Court reverse the final Decisions of the Board.

---

[8] See Response in IPR 2014-00207, A-943. This exhibit corresponds to exhibit 2004 in IPR 2014-00206. See Response in IPR 2014-00206, A-615.

## II. The Board erred by construing the "application program" to be an independently executable program and then inconsistently finding that Domini's spell checker program and Hachamovitch's word completion utility anticipate the claimed "application program"

### A. By construing "application program" to be an independently executable program, the Board adopted requirements that the prior art reference must meet to anticipate the limitation of the claim

After adopting a construction of a limitation, the Board must apply the same construction when evaluating the limitation against the prior art. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 375 (1996). Put another way, after the Board develops a particular construction, the prior art must meet the requirements of the construction to anticipate the limitation. *Id.* at 384-385.

In its final Decisions, the Board unambiguously construes the limitation "application program" to be an independently executable program: "On the full record, we determine that "application program" is construed as an independent executable program." [9] IPR 2014-00206 Final Decision, 12, A-12, and IPR 2014-00207 Final Decision, 11, A-80. Consequently, to find a reference anticipatory, the Board must demonstrate that the reference discloses an independently executable program.  Since Domini and Hachamovitch both fail to disclose an independently executable program, the Board erred by finding that Domini and Hachamovitch each anticipates the "application program" limitation of the claims.

---

[9] As discussed above in note 7, the Board does not distinguish between "independent executable program" and "independently executable program".

**B.    The Board erred in failing to determine whether Domini discloses an "independently executable program" in accordance with the Board's claim construction of "application program," and because the spell checker module in Domini functions at the behest of the word processing application, the Board erred in finding that Domini discloses an "application program"**

When evaluating Domini against the claim requirement of an "application program" (which it interprets as being one that is "independently executable") the Board disregards its own construction of the term. Instead of analyzing whether the spell checker program of Domini is an independently executable program, the Board largely adjourns its analysis once it finds the words "application program" recited in the reference.[10] IPR 2014-00206 Final Decision, 11, A-11 and IPR 2014-00207 Final Decision, 13, A-82. This practice is both improper and incomplete.

---

[10] Moreover, the Board unduly places the burden on Arendi to differentiate the use of the words "application program" in Domini from use of the same term in claims of Arendi's Patent:

> Patent Owner's arguments and evidence fail to address the term "application program" as it is used in Domini and show that it differs from the "application program" as recited in the challenged claims. Indeed, Dr. Levy has not provided testimony that the term "application program" as used in Domini (Ex. 1007, 7:41-52, Fig. 1) differs from or is inconsistent with "application program" as recited in the challenged claims. See Tr. 35:13-20…

IPR 2014-00206 Final Decision, 11, A-11 and IPR 2014-00207 Final Decision, 13, A-82. No such burden on Arendi exists. The task before the Board was applying the claim construction it had adopted to the structures of Domini, not rubber stamping Domini based on mere terminology. Moreover, we show below that this conclusory analysis misconstrued Domini's explanation of the prior art.

Once the Board adopts a construction of a claim limitation, the Board is obligated to govern its analysis of the prior art according to the requirements that the construction imputes to the limitation. *Markman*, 517 U.S. 370 at 375. Since the Board did not determine whether the programs in Domini are "independently executable programs", the Board's analysis is flawed, along with its findings of unpatentability based on Domini.

In relying on the recitation of "application program" in Domini, the Board gives its own "independently executable program" construction *de minimus* weight by latching onto Domini's mention of prior art "stand-alone" spell check program modules and Arendi's reference to the same:

> With respect to application programs in Domini, Patent Owner concedes that Domini discloses stand-alone spell checkers (PO Resp. 35-36 (citing Ex. 1007, 1:56-2:26; Ex. 2003 ¶ 24)), but argues that "a stand-alone spell checker would not be capable of inserting text into a word processor" (PO Resp. 36 (citing Ex. 2003 ¶¶ 24-25, 35)). We agree with Petitioner (Reply 11), however, that Domini discloses incorporating changes into a document by replacing words in the word processing document. Ex. 1007, 12:59-13:31, 14:42-67.

IPR 2014-00206 Final Decision, 15, A-15 and IPR 2014-00207 Final Decision, 13-14, A-82 to A-83; see also, Domini, col. 1, lines 56-58, A-248.

Because the cited passage constitutes the Board's entire discussion of Domini's "stand-alone" spell checkers (not to mention the extent to which Domini discloses an "independently executable program"), the Board appears to have assumed that the "stand-alone" spell checker is an "independently executable

program". This reasoning is flawed. Domini discusses stand-alone spell checkers only as prior art in the Background section of the patent:

> Spell checker program modules and grammar checker program modules were "stand-alone" products when they were initially introduced to personal computer users. In other words, spell checker program modules or grammar checker program modules were separate program modules from each other and from the word processor program module. These "stand-alone" program modules would scan documents of various formats, present errors, and suggest corrections, usually through a user interface, or dialog box. Later, the spell checker and grammar checker became integrated with word processor program modules.

Domini, col. 1, lines 56-66, A-248; see IPR 2014-00206 Response, A-634 *et seq.* and Levy Decl., paragraph 23 *et seq.*, and IPR 2014-00207 Response, A-967 *et seq.* The above passage shows that the stand-alone spell checker functions without a word processor, and, in terms of the claims of the '854 patent, lacks the required "first application program".

The Board appears to extract the general concept of a "stand-alone" product and impute the feature to the spell checkers that Domini implemented. This attribution has no basis in the description of Domini's own spell checkers. To the contrary, Domini mentions prior art "stand-alone" products in its background section for the very purpose of contrasting them against its own integrated spell checkers. See Domini, col. 1, lines 56-66, A-248, quoted above and Levy Decl., paragraph 24, A-664.

44

As discussed in further detail in the Statement of Facts, Dr. Levy points out that these stand-alone products, which were independently executable, are inapplicable to Arendi's claims because they could not insert into a document that is open in a word processor, and moreover, Domini contrasted the stand-alone products with the subsidiary programs described after the Background section. Levy Decl., paragraphs 24-26, A-664 to A-665; see also IPR 2014-00206 Response, 29-30, A-634 to A-635, and IPR 2014-00207 Response, 35-36, A-967 to A-968. Although the Board attempts to counter Dr. Levy's point that "Domini does not teach or suggest how a standalone spell checker would achieve insertion of a word into a document within a word processor", the Board references passages in Domini that relate, *not to the stand-alone spell checkers described in the Background section*, but rather to the subsidiary modules discussed in the Detailed Description.[11]

Moreover, as Arendi previously demonstrated to the Board, Domini discloses *dependent*, not independently executable, programs. IPR 2014-00206 Response, 25-31, A-630 to A-636; IPR 2014-00207 Response, 30-37, A-962 to A-969; and Levy Decl., paragraphs 20-22, A-660 to A-663. Dr. Levy provided a thorough analysis of the operation of Domini in determining whether each spelling module disclosed in Domini is independently executable, and that analysis was

---

[11] IPR 2014-00206 Decision at 15, A-15, citing Domini, col. 12, line 59-col. 13, line 31 and col. 14, lines 42-67, and IPR 2014-00207 Decision at 14, A-83, citing the same passage.

45

referenced in the foregoing Responses in the indicated passages. However, the

Board failed even to consider this evidence, just as it failed to evaluate whether any

of the spell checker modules in Domini are independently executable, even though

such an evaluation was a condition precedent to determining whether Domini

discloses an "application program" within the meaning of the claims of the '854

patent.

Because the Board erred in failing to determine whether Domini discloses an

"independently executable program" in accordance with the Board's claim

construction, and since the spell checker module in Domini functions at the behest

of the word processing application, the Board erred in finding that Domini

discloses an independently executable "application program". Arendi respectfully

requests that this Court reverse the final Decisions of the Board.

### C. The Board erred in failing to determine whether Hachamovitch discloses an "independently executable program" in accordance with the Board's claim construction of "application program," and because the word completion utility of Hachamovitch functions at the behest of another application program, the Board erred in finding that Hachamovitch discloses an "application program"

When evaluating Hachamovitch against the claim requirement of an

"application program" (which it interprets as being one that is "independently

executable") the Board, just as it did in the case of Domini, disregards its own

construction of the term. Instead of analyzing whether the word completion

program of Hachamovitch is an independently executable program, the Board

again largely adjourns its analysis once it finds the mere recitation of keywords –
in this case, "application-independent" as applied to a word completion utility.
Just as in the case of Domini, this practice is flawed. Having adopted a construction
of a claim limitation, the Board is obligated to use the claim construction in
applying the prior art to the claim. *Markman*, *supra*, 517 U.S. 370 at 375. Since the
Board failed to determine whether the Hachamovitch program is an "independently
executable program", the Board's analysis is flawed, along with its findings of
unpatentability based on Hachamovitch.

In its final Decision, relying on the recitation of "application-independent"
in Hachamovitch, the Board gives its own "independently executable program"
construction *de minimus* weight:

> Based on the record, we find that Petitioner has shown that
> Hachamovitch discloses that the word completion utility can be
> deployed as a "stand-alone" "application-independent" utility. Pet. 38
> (Ex. 1008, 7:65-8:5). Hachamovitch states that "[t]o deploy the word
> completion system as an application-independent utility, an interface
> is defined within each application program through which the word
> completion utility may communicate with each application program."
> Ex. 1008, 8:6-9. Although the utility described in Hachamovitch
> operates through the application program, the reference expressly
> states that the utility can be part of the application program or operates
> independent of the applications as a "stand-alone" utility. Ex. 1008,
> 7:65-8:5.

IPR 2014-00207 Final Decision, 18, A-87.[12]

---

[12] In IPR 2014-00206, Hachamovitch was not at issue.

Although the Board seizes on the talisman of "application-independent" to rush to its conclusion that Hachamovitch meets the requirements of the claimed "application program", Arendi had provided Dr. Levy's testimony, not addressed by the Board, that when a program is "application-independent", such a program has a standard interface and is a subsidiary program, not one that is independently executable. See Levy Decl., paragraphs 30-32, A-668 to A-670, which are reproduced in the Statement of Facts. Dr. Levy explained previously that a utility operating synchronously and cooperatively as part of an application program is a subsidiary program that is not independently executable. Levy Decl., paragraphs 17-18, A-658 to A-659. These points were further referenced in Arendi's Response. IPR 2014-00207 Response, 42-44, A-974 to A-976.

The evidence of record, therefore, establishes that the "application-independent" utility of Hachamovitch is not independently executable and is rather a subsidiary program. The Board's failure to address this evidence is legal error. Moreover, the Board committed legal error in failing to determine whether Hachamovitch discloses an "independently executable program" in accordance with the Board's claim construction. The Board further committed legal error in failing to address evidence of record, namely Dr. Levy's testimony that the "application-independent" utility of Hachamovitch is not independently executable and is, instead, a subsidiary program. Finally, the Board committed legal error in

48

finding that Hachamovitch discloses an independently executable "application program".  For these reasons, Arendi respectfully requests that this Court reverse the final Decision of the Board in IPR 2014-00207 as to the anticipation and the obviousness grounds over Hachamovitch. Because Hachamovitch is the only ground levied against claims 3-5, 9-11, 38-41, and 45-48, recognition that the word completion utility in Hachamovitch is not an "application program" requires reversal of the Board's decision that claims 3-5, 9-11, 38-41, and 45-48 are unpatentable, regardless of this Court's findings on Domini.

III.    **The Board erred by ignoring the intrinsic evidence of the claims themselves and interpreting the claim term "associated" not to require a pre-existing relationship**

A.    **Contrary to the requirements of *Permahedge* and *Phillips*, the Board failed to construe "associated" to account for the manner in which the term was recited throughout the claims**

*Phillips*, discussed in section I, stands for the proposition not only that patent claims must be interpreted in a manner that is consistent with the specification, but also that the starting place for interpretation of terms in the patent claims is the patent claims themselves. *Phillips, supra*, 415 F.3d at 1314 (Fed. Cir. 2005). The *Phillips* court points out that "To begin with, the context in which a term is used in the asserted claim can be highly instructive….Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id*. See also *Interactive Gift*

*Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001), citing

authorities including *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed. Cir.

1996) and *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed.

Cir. 1999) ("The starting point for any claim construction must be the claims

themselves."). Additionally, according to *Permahedge*, terms should be construed

consistently in the same patent. *Am. Permahedge, Inc. v. Barcana, Inc.*, 105 F.3d

1441, 1446 (Fed. Cir. 1997). We show below that, in the present case, this intrinsic

evidence is highly instructive for the meaning of the term "associated".

Under Arendi's proposed construction for "associated", the limitation

"second information associated with the first information from a second

application program" requires the second information to have a pre-existing

relationship with the first information. IPR 2014-00206 Response, 15-19, A-620 to

A-624; IPR 2014-00207 Response, 16-20, A-948 to A-951. The Arendi proposed

construction rules out Domini as prior art, because what might constitute "second

information" in Domini is not found in a search for first information and therefore

lacks a pre-existing relationship with the first information. See IPR 2014-00206

Response, 31-34, A-636 to A-639; IPR 2014-00207 Response, 37-39, A-969 to A-

971. In its Decisions, the Board declined to adopt Arendi's construction and

interpreted "associated" to mean merely "connected or related". See IPR 2014-

00206 Final Decision, 7-9, A-7 to A-9; IPR 2014-00207 Final Decision, 8-9, A-77 to A-78.

The Board's reasoning is flawed, among other reasons, because in failing to account for the manner in which the term "associated" was used in claim 3, the Board disregarded intrinsic evidence instrumental for interpreting the limitation. Furthermore, the Board based its construction of "associated" on a misinterpretation of the specification of the patent.

Because the claim 3 also recites "associated", that claim should have formed a part of the basis for the construction of the term. *Permahedge*, *supra*, 105 F.3d at 1446 (Fed. Cir. 1997) and *Phillips*, 415 F.3d at 1315. Because claims 1 and 3 both recite the term "associated", both claims must be used to determine its meaning, and the same construction must be applied to both claims. Thus, the limitations of claim 3 guide the construction of the term "associated", and the construction ultimately governs the meaning of "associated" in claim 1.

In failing to account for the limitations of claim 3, the Board ignored the type of intrinsic evidence that has been recognized as valuable for claim interpretation. As explained in Arendi's Response to the Board, claim 3's recitation of "associated" informs the meaning of the limitation. IPR 2014-00207 Response,

16-17, A-948 and A-949. [13] As claim 3 recites "searching, using the second

application program, for the second information associated with the first

information", the claim grounds the term "associated" in the context of

"searching". Thus, the term "associated" indicates that there is an "association

between" the first and second information. *Id*. at 16, A-948. The association

between the first and second information enables the second information to be

found using a search that is based on the first information.

Additionally, claim 3 requires "retrieving the second information". *Id*. One

of ordinary skill in the art would understand that "searching" applies to the

searching of a data source and "retrieving" applies to the retrieval of the second

information from the same data source. *Id*. at 17, A-949, citing Exhibit 2003, Levy

Decl., paragraph 48, A-677. Therefore, the "association" between the first

information and the second information is equivalent to the association of data in a

database record. *Id*. As this association is stored, the association pre-exists before

the time of the search. In this manner, claim 3 limits the type of association

between first and second information to pre-existing relationships, thereby

supporting Arendi's construction of "associated".

---

[13] To similar effect, see IPR 2014-00206 Response, 15-19, A-620 to A-624, with
respect to claim 57.

In contrast, the Board reached its construction of "associated" by relying solely on the specification of the patent, which it misinterprets. In assessing the specification, the Board states:

> The '854 specification refers to related information that may match the searched data or data that corresponds to part of a typed name. Ex. 1001, 3:63-67, 4:43-58. Indeed, the '854 patent written description states that there may be "more than one *possible* contact/address match" to the first information and that "the program displays menu choices to the user to let him choose an appropriate answer" to insert. Ex. 1001, 4:46-49 (emphasis added).... [t]he '854 specification describes that a program operation based on a name or initials (the first information) could return more than one possible matching second information for insertion. Ex. 1001, 4:43-58.

IPR 2014-00207 Final Decision, 7-8, A-76 to A-77. From this possibility of multiple search results, the Board somehow concludes that no pre-existing relationship exists between the first and second information. However, this possibility of multiple search results in the specification is consistent with stored pre-existing relationships between first and second information, and it certainly does not preclude the existence of pre-existing relationships. Rather, for any given search of first information, embodiments of Arendi's inventions are capable of finding multiple search results. Each result, which yields different prospective second information, has its own pre-existing relationship with the first information.

Thus, the specification does not contemplate relationships between first and second

information that are broader than "pre-existing" ones. [14]

For at least the forgoing reasons, the Board erred by improperly construing

the term "associated" not to require a pre-existing relationship, and as a result, the

Board decision should be reversed.

**B.     In failing to account for the claim 1 as a whole, the Board failed to recognize that the past tense of "associated" requires a relationship to have been determined prior to the "entering a first information" step, and thus requires a pre-existing relationship between first and second information from the second application program**

When a claim term is interpreted, the first stop is the wording of the claim

itself:

> In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to "particularly point[] out and distinctly claim[ ] the subject matter which the patentee regards as his invention." 35 U.S.C. §112, ¶2.

> *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed.

Cir. 2001), citing authorities including *Vitronics Corp. v. Conceptronic, Inc.,* 90

---

[14] Similarly, the Board improperly failed to credit the specification's examples as illuminating interpretation of the term "associated". Compare, for example, IPR 2014-00207 Response, 17-19, A-949 to A-950 (the term "associated" refers to the association between a name and an address for a given database entry) with Final Decision, 8, A-77 ("limitations are not to be read into the claims from the specification").

F.3d 1576 (Fed. Cir. 1996); *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999) ("The starting point for any claim construction must be the claims themselves."); and *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed. Cir. 1995) (noting first the mandate to consult the claims). See also *Phillips*, *supra*, 415 F.3d 1303, 1314 ("Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms"). A reading of claim 1, taken as a whole, makes clear that the limitation in claim 1, "second information associated with the first information from a second application program", requires the second information to have a pre-existing relationship with the first information.

More particularly, considering claim 1 as a whole illuminates the temporality of the term "associated", which appears in the last limitation of the claim. Claim 1 has a preamble followed by three gerund phrases, and reads as follows, with the phrases being numbered for convenience:

> 1.    A method for information handling within a document created using a first application program comprising the steps of:
>
> [1] entering a first information in the first application program;
>
> [2] marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

[3] responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

See '854 patent, col. 10, lines 41-51, A-171.

Each of the claim's three phrases requires an action in the present tense: (1) "entering a first information"; (2) "marking … the first information to alert the user that the first information can be utilized in a second application program"; and (3) "responding to a user selection by inserting a second information".  In contrast to the present tense of each of these three phrases, "entering", "marking", and "responding … by inserting", the past tense form is used for the word "associated", which sits in the middle of the third phrase.

The significance of this temporal structure is that *before* the time corresponding to the first phrase of "entering a first information", the second information was already "*associated* with the second information from a second application program". Such an interpretation is required to make sense of the claim. The claims does not say that the second information *will be later* developed to relate to the first information; the claim uses the past tense "associated" to signify a point in time that had already passed at the time of present actions (1), (2), and (3).

A person of ordinary skill in the art would understand this claim 1 as conforming to the examples of the subject patent, wherein the first information and

the second information are associated in a database, which constitutes the "second application program", and this association exists even before the user enters the first information into a document.

Accordingly, a consideration of claim 1 taken as a whole leads to the conclusion that the past tense of "associated" in the claim requires that the first and second information have a pre-existing relationship from the second application program.

We have shown in this section III that when claims 1 and 3 are read together and when claim 1 is read as a whole, the term "associated" requires that the first and second information must have a pre-existing relationship from the second application program. The Board's determination to the contrary is erroneous and should be reversed.

## <u>CONCLUSION</u>

Because the Board committed legal error in finding claims 1-12, 19, 20, 22–26, 28–30, 36-49, 57, 58, 60–74, 76–78, 85, and 96 of the '854 patent unpatentable, the Court should reverse the Decisions for IPR 2014-00206 and IPR 2014-00207.

November 24, 2015

Respectfully submitted,

/s/Bruce D. Sunstein
Bruce D. Sunstein
Attorney for Arendi

Sunstein Kann Murphy & Timbers LLP
125 Summer Street
Boston, MA  02110-1618
(617) 443-9292

Of counsel:

Robert M. Asher
Sunstein Kann Murphy & Timbers LLP
125 Summer Street
Boston, MA  02110-1618
(617) 443-9292

# ADDENDUM

Trials@uspto.gov                                                     Paper 32
Tel: 571-272-7822                                      Entered: June 9, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC., GOOGLE INC., and MOTOROLA MOBILITY LLC,
Petitioner,

v.

ARENDI S.A.R.L.,
Patent Owner.
_____

Case IPR2014-00206
Patent 7,496,854 B2
_____

Before HOWARD B. BLANKENSHIP, SALLY C. MEDLEY, and
TREVOR M. JEFFERSON, *Administrative Patent Judges.*

JEFFERSON, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00206
Patent 7,496,854 B2

## I.  INTRODUCTION

### A.  Background

Apple Inc., Google Inc., and Motorola Mobility LLC (collectively "Petitioner") filed a Petition (Paper 3, "Pet.") to institute an *inter partes* review of claims 19–35, 57–85, 96, and 99 of U.S. Patent 7,496,854  B2 (Ex. 1001, "the '854 patent").  Pet 1; *see* 35 U.S.C. § 311.  Arendi S.A.R.L. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp."). Pursuant to 35 U.S.C. § 314, in our Decision to Institute (Paper 9, "Dec."), we instituted trial as to claims 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96.

After the Decision to Institute, Patent Owner filed a Patent Owner Response (Paper 16, "PO Resp.") and Petitioner filed a Reply to the Patent Owner Response (Paper 20, "Reply").  An oral hearing (Paper 31, "Tr.") was held on February 4, 2015.

### B.  Related Matters

Patent Owner has sued Petitioner for infringement of the '854 patent in *Arendi S.A.R.L. v. Apple Inc*., No. 1:12-cv-01596-LPS (D. Del.); *Arendi S.A.R.L. v. Google Inc.*, No. 1:13-cv-00919 (D. Del.); and *Arendi S.A.R.L. v. Motorola Mobility LLC*, Case No. 1:12-cv-01601-LPS (D. Del.).  Pet. 1; Paper 6, 2–3.  The '854 patent is also the subject of a petition in IPR2014-00207 filed by Petitioner.  *Id*. at 3–4.  We granted *inter partes* review as to claims 1–12 and 36–49 of the '854 patent in *Apple Inc. et al v. Arendi S.A.R.L.*, Case IPR2013-00207, slip op. at 23–24 (PTAB June 11, 2014) (Paper 9).

2

IPR2014-00206
Patent 7,496,854 B2

C. *The Asserted Ground*

We instituted trial based on the ground of unpatentability set forth in

the table below.  Dec. 16–18, 22.

| Reference | Basis | Claims Challenged |
|---|---|---|
| Domini[1] | 35 U.S.C. § 102(e) | 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96 |

D. *The '854 Patent*

The '854 patent, titled "Method, System and Computer Readable

Medium for Addressing Handling From a Computer Program," relates to

computer implemented processes for providing a computer program, such as

a word processing program or spreadsheet program, that is coupled to an

information management source, such as a database program or contact

management program.  Ex. 1001, 1:19–50.

Figures 3 and 4 of the '854 patent are reproduced below.



FIG. 3

---

[1] U.S. Patent No. 6,085,206, issued July 4, 2000, filed June 20, 1996 (Ex.
1006, "Domini")

3

IPR2014-00206
Patent 7,496,854 B2



FIG. 4

Figure 3 illustrates the inputting of a name to be searched into a document.
Figure 4 illustrates a retrieved address that is inserted into a document.
Ex. 1001, 2:51–57.  The user types a name into the document.  When the
user clicks on OneButton 42, the claimed process is launched, retrieving
name 40 from the document, searching a database for name 40, and inserting
the retrieved address associated with name 40 into the document as shown in
Figure 4.  *Id.* at 5:60–6:5.

Figure 2 of the '845 patent, illustrating a flow chart of a method for
address handling within a computer program, is reproduced below.

4

IPR2014-00206
Patent 7,496,854 B2



FIG. 2

Figure 2 depicts a flow chart of the address handling process initiated by the user clicking on OneButton 42 of Figure 4. At step 4, text typed by the user in a document is analyzed for contact information. At step 6, if the identified contact information includes a name, a search occurs in the database at step 12. When the database finds a name with more than one possible matching address, the user is prompted for a decision, and that selected information is added to the document at step 22. *Id*. at 5:10–22, 6:4–5.

Independent claim 19, reproduced below, is illustrative of the claimed subject matter:

> 19.   A method for information handling within a document created by a first application program comprising the steps of:
>
>     entering a first information in the first application program;
>
>     marking without user intervention the first information to alert the user that the first

5

IPR2014-00206
Patent 7,496,854 B2

information can be utilized in a second application program; and

responding to a user selection by performing an operation related to a second information, the second information associated with the first information from the second application program.

## II. ANALYSIS

### A. *Claim Construction*

The Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1279–81 (Fed. Cir. 2015). Claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

### 1. *"marking . . . the first information to alert the user"*

The claim phrase "marking without user intervention the first information to alert the user" appears in independent claims 19 and 25. In the Decision to Institute, we preliminarily construed "marking without user intervention the first information to alert the user" to mean that the first information is detected and has some form of marking applied to it without user intervention. Dec. 8. We also determined that "marking" included the acts of highlighting, designating, or displaying the information in a separate screen or window to draw a user's attention. *Id.*

The parties do not dispute this preliminary construction. Based on the record before us, we determine that "marking" includes highlighting,

6

IPR2014-00206
Patent 7,496,854 B2

designating, or displaying the information in a separate screen or window to draw a user's attention.

### 2.  *"performing an operation related to second information"*

The claim phrase "performing an operation related to second information," appears in independent claims 19, 25, 57, 73, 85, and 96.  In the Decision to Institute, we determined that "performing an operation related to second information" encompasses operations on pre-existing information or new information that may be the second information itself or related to the second information.  Dec. 8–9.  The parties do not dispute this preliminary construction.  Based on the complete record, we determine that "performing an operation related to second information" includes operations on pre-existing information or new information that may be the second information itself or related to the second information.

### 3.  *"associated" and "second information associated with the first information from a second application program"*

"Associated" appears in the claim phrase "second information associated with the first information from a second application program" recited in independent claims 19, 25, 57, 73, 85, and 96.  In the Decision to Institute, we determined preliminarily that "associated" is construed as "connected or related" (Dec. 10) and that "second information associated with the first information from a second application program" included second information that is related to or connected with the first information from a second application program (Dec. 11).

Patent Owner contends that because "associated" in dependent claim 64 describes searching for and retrieving the second information "associated" with the first information, this indicates that the "association" is

7

IPR2014-00206
Patent 7,496,854 B2

equivalent to the association of a data in a database record.  PO Resp. 16.
Thus, Patent Owner argues that the searching limitations found in dependent
claim 64 and independent claims 85 and 96 "requires that the association
between the first and second information is a 'pre-existing relationship,'
such as, the association between field entries for a database record in a
database."  PO Resp. 18–19.

Patent Owner further contends that the '854 patent discloses
embodiments that refer to a connection between a name and address, or
other pre-existing relationship that is akin to a database entry.  PO Resp. 17
(citing Ex. 1001, 5:65–6:3).  Patent Owner argues that the '854 patent
embodiments refer to finding and inserting the second information, showing
that "there must be a pre-existing relationship for an action to be based upon
the second information, such as the act of insertion."  PO Resp. 17.

We are not persuaded by Patent Owner's argument that a "pre-
existing" relationship is required for "second information associated with the
first information from a second application program" as recited in
independent claims 19, 25, 57, 73, 85, and 96.  The '854 specification refers
to related information that may match the searched data or data that
corresponds to part of a typed name.  Ex. 1001, 3:63–67, 4:43–58; *see*
Dec. 10; Reply 11–12.  Indeed, the '854 patent written description states that
there may be "more than one *possible* contact/address match" to the first
information and that "the program displays menu choices to the user to let
him choose an appropriate answer" to insert.  Ex. 1001, 4:46–49 (emphasis
added).  Thus, Patent Owner has not demonstrated that a pre-existing
relationship is described in the '854 specification.

8

IPR2014-00206
Patent 7,496,854 B2

Patent Owner's arguments limiting the term "associated" to the examples in the '854 specification referring to databases also is not commensurate in scope with the breadth of the claims or the broadest reasonable interpretation.  We must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment.  *See In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (stating that "limitations are not to be read into the claims from the specification").  In the present case, Patent Owner has not shown persuasively that a person of ordinary skill would have understood the "second information associated with the first information from a second application program" as being limited to a "pre-existing relationship" between two pieces of information based on the claims, embodiments, and examples in the '854 specification.  To the contrary, the '854 specification describes that a program operation based on a name or initials (the first information) could return more than one possible matching second information for insertion.  Ex. 1001, 4:43–58.

In sum, under the broadest reasonable interpretation, we do not determine that "associated" as recited in "second information associated with the first information from a second application program" is limited to a pre-existing relationship.  We determine that "associated" is construed as "connected or related" and that that "second information associated with the first information from a second application program" includes second information that is related to or connected with the first information from a second application program.

9

IPR2014-00206
Patent 7,496,854 B2

### 4. *"application program"*

In the Decision to Institute, we determined that "application program" encompasses an independent executable program. Dec. 11–12. In so determining, we rejected Patent Owner's narrow construction of application program as "an independently executable computer program designed to assist in the performance of a specific task, such as word processing or spreadsheet processing or contact management or e-mail or calendaring." Dec. 11–12; Prelim. Resp. 9.

Patent Owner contends that it agrees with our interpretation of an "application program" as an independently executable program, but interprets "independently executable program"[2] in a manner that excludes programs that do not have certain attributes. PO Resp. 8–15. Based on the background section of the '854 patent that refers to retrieval of information from sources external to a word processor, such as a database or contact management program, Patent Owner asserts that the claimed invention is limited to obtaining information from an information management program that can be used separately and independently from the word processor. PO Resp. 11 (citing Ex. 1001, 1:34–37, 1:45–46).

Patent Owner's interpretation of "application program" is based on the commonly shared features of the example programs from the

---

[2] Patent Owner suggests that the Decision to Institute's use of the term "independent" rather than "independently" in construing "'application program' to encompass an independent executable program" (Dec. 11) was a typographical error. PO Resp. 9–10. Patent Owner does not explain how "independent" differs from "independently" and defines the term "independent" as part of its analysis. *Id*. at 10. For purposes of this Decision, we address Patent Owner's contentions as if they apply to both "independent" and "independently."

10

specification. PO Resp. 13 ("Given that the specification identifies word processors, spreadsheet programs, information management programs and database programs as examples of application programs, the definition of an 'application program' can be construed from the commonly shared features."). Patent Owner relies on the Declaration of Dr. John Levy (Ex. 2003), paragraphs 42–43, to support its interpretation that subsidiary programs, which extend the functionality of the controlling application, are not "independently executable computer programs" as recited in the claims. PO Resp. 14–15.

We disagree with Patent Owner's narrow interpretation. The term "application program" does not appear in the specification of the '854 patent. However, we are not persuaded that the term is limited by the commonly shared features of the examples in the '854 patent specification. *See Van Geuns*, 988 F.2d at 1184 ("[L]imitations are not to be read into the claims from the specification."). Patent Owner has not provided sufficient evidence to limit "application program" to programs that are not under the control of another program or run synchronously under the control of a separate application program (PO Resp. 13–14). We do not find Dr. Levy's testimony persuasive that the broadest reasonable interpretation of "application program" by one of ordinary skill in the art at the time of the invention is defined by "commonly shared features" of examples of computer programs in the patent specification. *See* PO Resp. 11–15 (citing Ex. 2003 ¶¶ 42–44); 25 (citing Ex. 2003 ¶¶ 18, 42–48)). Construing application program as Patent Owner suggests improperly limits the claim term to the embodiments and examples in the '854 patent specification and imports negative limitations unsupported by the intrinsic evidence.

11

IPR2014-00206
Patent 7,496,854 B2

Patent Owner has not shown that the broadest reasonable construction of "application program" excludes subsidiary programs. *See* PO Resp. 11–15; Reply 6–9. On the complete record, we determine that "application program" is construed as an independent executable program.

### B. Unpatentability Based on Domini (Ex. 1006)

Petitioner contends that claims 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96 are anticipated by Domini. Pet. 30–39. Petitioner's claim chart provides citation to Domini, which Petitioner contends disclose the corresponding claim limitations in claims 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96. *Id.*

### 1. Overview of Domini (Ex. 1006)

Domini discloses identifying and correcting spelling and grammar errors in a document created by a word processing program. Ex. 1006, Abstract, 4:65–5:11. Figure 1, below, shows an embodiment of the Domini invention. *Id.* at 4:39–41.



**FIG.1**

12

IPR2014-00206
Patent 7,496,854 B2

Figure 1 depicts personal computer 10 connected by networks 12 and 13 to remote computer 11. *Id.* at 7:13–16. Domini discloses that "[t]hose skilled in the art will understand that program modules such as an operating system 36, application programs 37, and data are provided to the personal computer 10." *Id.* at 7:41–43. Thus, personal computer 10 and remote computer 11 contain program modules, such as operating system 36 and application programs 37. *Id.* at 6:33–42, 7:41–44. Domini states further that:

> [t]he *application programs* 37 may include a number of different programs such as a word processing program 37a, a *spell checker program 37b*, and a grammar checker program 37c. In the preferred personal computer 10, the local hard disk drive 20 is used to store data and programs, including the operating system and programs.

*Id.* at 7:46–52 (italics added).

In the spelling and grammar programs disclosed in Domini, the user selects the "[s]pelling and [g]rammar" command to initialize the spell check program. *Id.* at 16:13–16. Without user intervention, the spell check program identifies misspelled words and presents them in red, bold typeface. *Id.* at 17:27–33, 4:12–16. The spell check program also displays a list of suggested corrections that may be selected and entered into the document by the user. *Id.* at 1:42–44, 12:1–5, 12:61–64.

### 2. Anticipation based on Domini (Ex. 1006)
#### a. Application Programs

Patent Owner argues that Domini fails to teach the "second application program" as recited in each of the challenged independent claims, because the spell checker described in Domini is a "module" that operates inside of a word processing document and not an "application

13

IPR2014-00206
Patent 7,496,854 B2

program" that is an "independent executable program" as the term is construed.  PO Resp. 23–24.

Patent Owner's arguments and analysis are based on its proposed claim interpretation that excludes subsidiary programs from "application program" as recited in the challenged claims.  PO Resp. 25 (contrasting subsidiary programs with application programs and stating that it "would be understood by one of ordinary skill in the art at the time of the invention, an 'application program' is an 'independently executable program' that is independent of and not under the control of another program." (citing Ex. 2003 ¶¶ 42–48)).  As discussed above, we do not construe "application program" to exclude subsidiary programs based on characteristics of the example programs described in the '854 patent specification.  *See* Section II.A.4, *supra*.

We also are not persuaded by Patent Owner's arguments and testimony of Dr. Levy that the program modules in Domini that are explicitly identified as "application programs" do not meet the claim limitation for "application program."  PO Resp. 25–29.  Dr. Levy's narrow interpretation of application program reads limitations into the claim (PO Resp. 25) that are not supported by the '854 specification.  *See* Reply 8–9 (citing Ex. 1001, 7:25–8:7).

Patent Owner's argument that one of ordinary skill in the art would have understood spell checker program 37b to be a program module (PO Resp. 27–28) and not an application program—as it is expressly described— is not supported by a plain reading of the Domini disclosure.  Patent Owner's arguments and evidence fail to address the term "application program" as it is used in Domini and show that it differs from the

14

"application program" as recited in the challenged claims.  Indeed, Dr. Levy has not provided testimony that the term "application program" as used in Domini (Ex. 1006, 7:41–52, Fig. 1) differs from or is inconsistent with "application program" as recited in the challenged claims.  *See* Tr. 35:13–20 (stating that Patent Owner's expert found Domini consistent with Patent Owner's construction).

With respect to the "application programs" in Domini, Patent Owner concedes that Domini discloses stand-alone spell checkers (PO Resp. 29–31 (citing Ex. 1006, 1:56–2:26; Ex. 2003 ¶ 24)), but argues that "a stand-alone spell checker would not be capable of inserting text into a word processor" (PO Resp. 30 (citing Ex. 2003 ¶¶ 24–25, 35)).  We agree with Petitioner (Reply 11), however, that Domini discloses incorporating changes into a document by replacing words in the word processing document.  Ex. 1006, 12:59–13:31, 14:42–67.

We disagree with Patent Owner's narrow interpretation of the term "application program" that excludes spell checker program 37b explicitly disclosed in Domini (Ex. 1006, 7:46–52).  PO Resp. 25–29.  Instead, we find that spell checker program 37b and other application programs in Domini disclose the "application program" recited in the challenged claims.  Based on the complete record and in light of Patent Owner's and Petitioner's arguments and evidence, we find, by a preponderance of the evidence, that Domini discloses an "application program" as recited in the challenged claims.

IPR2014-00206
Patent 7,496,854 B2

  b. *"the second information associated with the first*
  *information from the second application program" and*
  *"operation related to a second information" of "entering*
  *additional data into a database"*

Patent Owner's argument that Domini fails to disclose "the second information associated with the first information from the second application program" is based on the erroneous claim construction that "associated" requires a pre-existing relationship between the first and second information. PO Resp. 31–34. Because we determined previously that "associated" is construed as "connected or related" (*see* Section II.A.3, *supra*), we are not persuaded by Patent Owner's argument. Patent Owner's argument that Domini does not disclose a pre-existing relationship, "such as the relationship between field entries of a database record" (PO Resp. 32) is premised on an overly narrow interpretation of the claim term that is not commensurate in scope with the challenged claims.

We also are not persuaded by Patent Owner's contention that Domini fails to disclose the "operation related to a second information" of "entering additional data into a database" limitations of dependent claims 22–24, 28–30, 60–62, and 76–78. PO Resp. 34–38. Patent Owner argues that "Domini's act of adding a (misspelled) word from the document (first information) into the dictionary is not an operation related to second information. Rather, it is an operation relating to the first information." PO Resp. 37 (emphasis omitted).

We disagree. Patent Owner's contention assumes erroneously that the first and second information are not related and that "an operation related to the second information" is limited to actions involving only the second information. However, Patent Owner has not shown that "performing an

16

IPR2014-00206
Patent 7,496,854 B2

operation related to second information," includes operations on pre-existing information or new information that may be the second information itself or related to the second information. *See* Section II.A.2, *supra*. Thus, the operation could be on new information that is related to the second information.

We find that the act of adding a related spelling of a word, such as a plural form or alternate spelling of a word, to a dictionary or database is an operation related to the second information as recited in the claims. *See, e.g.*, Reply 12–13 (discussing "neighbo**u**r" and "neighbor" as alternate spellings that are related first and second information); Pet. 32 (citing Ex. 1006, Fig. 3, 5, 7, 12:1–5, 12:61–64). In addition, the act of adding the second information (e.g., alternate spelling) to the document is also an "operation related to a second information." Thus, we find that Domini's disclosure regarding the storing of first information in the dictionary is an operation related to the second information. *See* Pet. 31–32.

Accordingly, we do not agree with Patent Owner that Domini fails to disclose "an operation related to a second information" as required in dependent claims 22–24, 28–30, 60–62, and 76–78. Based on the full record, we find that Petitioner has shown by a preponderance of the evidence that Domini discloses "the second information associated with the first information from the second application program" as recited in independent claims 19, 25, 57, 73, 85 and 96; and an "operation related to a second information" of "entering additional data into a database" as recited in dependent claims 22–24, 28–30, 60–62, and 76–78.

17

IPR2014-00206
Patent 7,496,854 B2

> c. *"searching, using the second application program, for
> the second information associated with the first
> information"*

Patent Owner contends that that Domini fails to disclose "searching, using the second application program, for the second information associated with the first information" as recited in independent claims 85 and 96 and dependent claims 64–69. PO Resp. 38–43. Patent Owner's argument is that Domini searches for the individual words in the document but does not search for other information, such as "second information." PO Resp. 40. In the context of Domini's spell checker program, Patent Owner argues that Domini only determines whether the word is correctly spelled but is not looking for second information.

We disagree with Patent Owner. Although Patent Owner acknowledges that Domini provides suggested words, it argues that these words are not searched for but instead are located in the Spell Return Buffer. PO Resp. 42–43. We find that that Domini provides suggested words obtained from the Spell Return Buffer as suggested corrections. Pet. 30 (citing Ex. 1006, Fig. 3, 1:42–44, 12:1–5). Patent Owner's argument that Domini does not describe explicitly searching for the suggested spelling corrections ignores the fact that suggested corrections are retrieved and displayed as part of the Domini spell checker process. Ex. 1006, Fig. 3, 1:42–44, 12:1–5. We also agree with Petitioner's argument that the spell check program has one or more dictionaries from which suggested corrections are obtained. Pet. 35. In addition, Petitioner's expert, Daniel A. Menascé, Ph.D, testified persuasively that the Domini spell checker retrieves possible words that are related to the words that a user types. *See* Ex. 1012, Deposition of Daniel A. Menascé, Ph.D, 127:3–130:5.

18

IPR2014-00206
Patent 7,496,854 B2

Based on the complete record and the evidence and arguments presented by Petitioner and Patent Owner, we find, by a preponderance of the evidence, that Domini discloses "searching, using the second application program, for the second information associated with the first information" as recited in independent claims 85 and 96 and dependent claims 64–69.

### d. Conclusion

We have considered the evidence presented by Petitioner and Patent Owner. On the full record, we find that Petitioner has shown, by a preponderance of the evidence, that Domini anticipates claims 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96.

### C. Patent Owner's Motion to Exclude Evidence

Patent Owner moves to exclude the deposition transcript of Petitioner's expert, Dr. Daniel A. Menascé, Exhibit 1012. Paper 22. Dr. Menascé was deposed by Patent Owner's counsel on August 7, 2014 for this proceeding and for proceedings IPR2014-00207 and IPR2014-00208. Ex. 1012, 1. Patent Owner contends the Menascé transcript is improper supplemental information that is not submitted in compliance with 37 C.F.R. § 42.123 and re-uses a previously used Exhibit number and should be excluded. Paper 22, 2.

With respect to the mis-numbered Exhibit, we deny Patent Owner's motion to exclude the Exhibit for failing to meet numbering requirements of 37 C.F.R. § 62.63(c).

With respect to the transcript being improper supplemental information, Petitioner argues and we agree that 37 C.F.R. § 42.53(f)(7) states that deposition testimony must be filed by its proponent as an exhibit.

19

IPR2014-00206
Patent 7,496,854 B2

Paper 26, 3–4.  Consistent with Petitioner's position, the rule recently has been clarified.  *See* Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 80 Fed. Reg. 28,561, 28,563 (May 19, 2015) ("To clarify that either party is permitted to file testimony as an exhibit, the Office amends 37 CFR 42.53(f)(7) to delete the phrase 'by proponent' in the second sentence.").  Because either party is permitted to file testimony as an exhibit, Petitioner's filing of the exhibit is proper.  Accordingly, we *deny* Patent Owner's motion to exclude Exhibit 1012, the deposition transcript of Petitioner's expert, Dr. Daniel A. Menascé.

Patent Owner also seeks to exclude "Exhibit 1015," Visual Studio 2012 ("VS2012"), filed as an attachment to the deposition transcript of John V. Levy, Ph.D. (Ex. 1011).[3]  Paper 22, 10.  Patent Owner implicitly acknowledges that Petitioner's Reply to Patent Owner's Response does not expressly discuss or rely on VS2012.  Paper 22, 11.  Because we do not consider or rely on VS2012, or the portion of Dr. Levy's testimony discussing VS2012, in reaching our determinations in this Decision, Patent Owner's motion to exclude "Exhibit 1015" of Exhibit 1011 is *dismissed* as moot.

## III.    CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that claims 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96 are unpatentable as anticipated by Domini.

---

[3] Although the attachment is labelled "Exhibit 1015," VS2012 was not entered into the file as Exhibit 1015.

20

IPR2014-00206
Patent 7,496,854 B2

IV.    ORDER

For the reasons given, it is

ORDERED that, based on a preponderance of the evidence, claims 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96 of U.S. Patent No. 7,496,854 B2 are held unpatentable; and

FURTHER ORDERED that Patent Owner's motion to exclude "Exhibit 1015" is *dismissed*, and the motion to exclude Exhibit 1012, the deposition transcript of Dr. Daniel A. Menascé is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00206
Patent 7,496,854 B2


For Petitioner:

David L. Fehrman
dfehrman@mofo.com

Mehran Arjomand
marjomand@mofo.com

Matthew A. Smith
smith@turnerboyd.com

Zhuanjia Glu
gu@turnerboyd.com

For Patent Owner:

Robert Asher
rasher@sunsteinlaw.com

Bruce Sunstein
bsunstein@sunsteinlaw.com

22

Trials@uspto.gov                                          Paper 32
Tel: 571-272-7822                              Entered: June 9, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

APPLE INC., GOOGLE INC., and MOTOROLA MOBILITY LLC,
Petitioner,

v.

ARRENDI S.A.R.L.,
Patent Owner.
_____

Case IPR2014-00207
Patent 7,496,854 B2
_____

Before HOWARD B. BLANKENSHIP, SALLY C. MEDLEY, and TREVOR M.
JEFFERSON, *Administrative Patent Judges.*

JEFFERSON, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00207
Patent 7,496,854 B2

# I.  INTRODUCTION

## A.  Background

Apple Inc., Google Inc., and Motorola Mobility LLC (collectively "Petitioner") filed a Petition (Paper 3, "Pet.") to institute an *inter partes* review of claims 1–18, 36–56, 86–95, 97, 98, 100, and 101 of U.S. Patent 7,496,854 B2 (Ex. 1001, "the '854 patent").  Pet 1; *see* 35 U.S.C. § 311.  Arendi S.A.R.L. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.").  Pursuant to 35 U.S.C. § 314, in our Decision to Institute (Paper 9, "Dec."), we instituted this trial as to claims 1–12 and 36–49.  Dec. 23–24.

After the Decision to Institute, Patent Owner filed a Patent Owner Response (Paper 16, "PO Resp.") and Petitioner filed a Reply to the Patent Owner Response (Paper 20, "Reply").  An oral hearing (Paper 31, "Tr.") was held on February 4, 2015.

## B.  Related Matters

Patent Owner has sued Petitioner for infringement of the '854 patent in *Arendi S.A.R.L. v. Apple Inc.*, No. 1:12-cv-01596-LPS (D. Del.); *Arendi S.A.R.L. v. Google Inc.*, No. 1:13-cv-00919 (D. Del.); and *Arendi S.A.R.L. v. Motorola Mobility LLC*, Case No. 1:12-cv-01601-LPS (D. Del.).  Pet. 1; Paper 6, 2–3.  The '854 patent is also the subject of a petition in IPR2014-00206, also filed by Petitioner.  *Id*. at 3–4.  We instituted *inter partes* review as to claims 19, 20, 22–26, 28–30, 57, 58, 60–74, 76–78, 85, and 96 of the '854 patent in *Apple Inc. v. Arendi S.A.R.L.*, Case IPR2014-00206, slip op. at 22 (PTAB June 11, 2014) (Paper 9).

## C.  References Relied Upon

Petitioner relies upon the following prior art references:

2

IPR2014-00207
Patent 7,496,854 B2

| Reference | Exhibit |
|---|---|
| U.S. Patent No. 6,085,206 ("Domini") | Ex. 1007 |
| U.S. Patent No. 6,377,965 ("Hachamovitch") | Ex. 1008 |

D. *The Alleged Grounds of Unpatentability*

We instituted this trial based on the ground of unpatentability set forth in the table below.  Dec. 14–16, 17–22, 23.

| Reference | Basis | Claims Challenged |
|---|---|---|
| Domini | 35 U.S.C. § 102(e) | 1–12, 36–38, 40–45, and 49 |
| Hachamovitch | 35 U.S.C. § 102(e) | 1–12 and 36–49 |
| Hachamovitch | 35 U.S.C. § 103(a) | 3–5, 9–11, 38–41, and 45–48 |

E. *The '854 Patent*

The '854 patent, titled "Method, System and Computer Readable Medium for Addressing Handling From a Computer Program," relates to computer implemented processes for providing a computer program, such as a word processing program or spreadsheet program, that is coupled to an information management source, such as a database program or contact management program. Ex. 1001, 1:19–50.

Figures 3 and 4 of the '854 patent are reproduced below.

3

IPR2014-00207
Patent 7,496,854 B2



FIG. 3



FIG. 4

Figure 3 illustrates the inputting of a name to be searched into a document. Figure 4 illustrates a retrieved address that is inserted into a document. Ex. 1001, 2:51–57. The user types a name into the document. When the user clicks on OneButton 42, the claimed process is launched, retrieving name 40 from the document,

4

searching a database for name 40, and inserting the retrieved address associated

with the name 40 into the document as shown in Figure 4. *Id*. at 5:60–6:5.

Figure 2 of the '845 patent, illustrating a flow chart of a method for address

handling within a computer program, is reproduced below.



FIG. 2

Figure 2 depicts a flow chart of the address handling process initiated by the user

clicking on OneButton 42 of Figure 4. At step 4, text typed by the user in a

document is analyzed for contact information. At step 6, if the identified contact

information includes a name, a search occurs in the database at step 12. When the

database finds a name with more than one possible matching address, the user is

prompted for a decision, and that selected information is added to the document at

step 22. *Id*. at 5:10–22, 6:4–5.

Independent claim 1, reproduced below, is illustrative of the claimed subject

matter:

> 1.   A method for information handling within a
> document created using a first application program
> comprising the steps of:

5

entering a first information in the first application program;

marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

## II. ANALYSIS

### A. Claim Construction

The Board interprets claims of an unexpired patent using the broadest reasonable construction in light of the specification of the patent in which they appear. *See* 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1279–81 (Fed. Cir. 2015). Claim terms generally are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

### 1. *"marking . . . the first information to alert the user"*

The claim phrase "marking without user intervention the first information to alert the user" appears in independent claims 1 and 7. In the Decision to Institute, we preliminarily construed "marking without user intervention the first information to alert the user" to mean that the first information is detected and has some form of marking applied to it without user intervention claim. Dec. 7–8. We also determined that "marking" included the acts of highlighting, designating, or displaying the information in a separate screen or window to draw a user's attention. *Id.*

6

IPR2014-00207
Patent 7,496,854 B2

The parties do not dispute this preliminary construction.  Based on the
record before us, we determine that "marking" includes highlighting, designating,
or displaying the information in a separate screen or window to draw a user's
attention.

### 2.  *"associated"*

"Associated" appears in the claim phrase "second information associated
with the first information from a second application program" recited in each of the
challenged independent claims 1, 7, 36, and 43.  In the Decision to Institute, we
determined preliminarily that "associated" is construed as "connected or related."
Dec. 9–10.

Patent Owner contends that because "associated" in dependent claim 3
describes searching for the second information "associated" with the first
information, this indicates that the "association" is equivalent to the association of
a data in a database record.  PO Resp. 16–17.  Patent Owner argues that the context
of the claims and embodiments of the '854 patent "requires that the association
between the first and second information is a 'pre-existing relationship,' such as,
the association between field entries for a database record in a database."  PO
Resp. 20.  Patent Owner further contends that the '854 patent embodiments refer to
finding and inserting the second information, such that "there must be a pre-
existing relationship for an action to be based upon the second information, such as
the act of insertion."  PO Resp. 17–18 (citing Ex. 1001, 5:65–6:3).

We are not persuaded by Patent Owner's argument that a "pre-existing"
relationship is required for "second information associated with the first
information from a second application program."  The '854 specification refers to
related information that may match the searched data or data that corresponds to

7

IPR2014-00207
Patent 7,496,854 B2

part of a typed name.  Ex. 1001, 3:63–67, 4:43–58.  Indeed, the '854 patent written description states that there may be "more than one *possible* contact/address match" to the first information and that "the program displays menu choices to the user to let him choose an appropriate answer" to insert.  Ex. 1001, 4:46–49 (emphasis added).  Thus, Patent Owner has not demonstrated that a pre-existing relationship is described in the '854 specification.

Patent Owner's arguments limiting the term "associated" to the examples in the '854 specification referring to databases also is not commensurate in scope with the breadth of the claims or the broadest reasonable interpretation.  We must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment.  *See In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993) (stating that "limitations are not to be read into the claims from the specification").  In the present case, Patent Owner has not shown persuasively that a person of ordinary skill would have understood the "second information associated with the first information from a second application program" as being limited to a "pre-existing relationship" between two pieces of information based on the claims, embodiments, and examples in the '854 specification.  To the contrary, the '854 specification describes that a program operation based on a name or initials (the first information) could return more than one possible matching second information for insertion.  Ex. 1001, 4:43–58.

In sum, under a broadest reasonable interpretation, we do not find that "associated" as recited in "second information associated with the first information from a second application program" is limited to a pre-existing relationship.  We determine that "associated" is construed as "connected or related" and that that "second information associated with the first information from a second

8

application program" includes second information that is related to or connected with the first information from a second application program.

### 3. "application program"

In the Decision to Institute, we determined that "application program" encompasses an independent executable program. Dec. 10. In so determining, we rejected Patent Owner's narrow proposed construction of application program as "an independently executable computer program designed to assist in the performance of a specific task, such as word processing or spreadsheet processing or contact management or e-mail or calendaring." Prelim. Resp. 9; Dec. 10.

Patent Owner contends that it agrees with our interpretation (PO Resp. 11) of an "application program" as an independently executable program, but attempts to interpret "independently executable program"[1] in a manner that excludes programs with certain attributes. *See* PO Resp. 10–16. Based on the background section of the '854 patent that refers to retrieval of information from sources external to a word processor, such as a database or contact management program, Patent Owner asserts that the claimed invention is limited to obtaining information from an information management program that can be used separately and independently from the word processor. PO Resp. 12 (citing Ex. 1001, 1:34–37, 1:45–46).

---

[1] Patent Owner suggests that the Decision to Institute's use of the term "independent" rather than "independently" in construing "'application program' to encompass an independent executable program" (Dec. 11) was a typographical error. PO Resp. 10–11. Patent Owner does not explain how "independent" differs from "independently" and defines the term "independent" as part of its analysis. *Id.* at 10–11. For purposes of this Decision, we address Patent Owner's contentions as if they apply to both "independent" and "independently."

Patent Owner's interpretation of "application program" is based on the commonly shared features of the example programs from the specification.  PO Resp. 14 ("Given that the specification identifies word processors, spreadsheet programs, information management programs and database programs as examples of application programs, the definition of an 'application program' can be construed from the commonly shared features.").  Patent Owner relies on the Declaration of Dr. John Levy (Ex. 2003), paragraphs 42–43, to support its interpretation that subsidiary programs, which extend the functionality of the controlling application, are not "independently executable computer programs" as recited in the claims.  PO Resp. 12.

We disagree with Patent Owner's narrow interpretation.  The term "application program" does not appear in the specification of the '854 patent.  However, we are not persuaded that the term is limited by the commonly shared features of the examples in the '854 patent specification.  *See Van Geuns*, 988 F.2d at 1184 ("[L]imitations are not to be read into the claims from the specification.").  Patent Owner has not provided sufficient evidence to limit "application program" to programs that are not under the control of another program or run synchronously under the control of a separate application program (PO Resp. 13–14).   We do not find Dr. Levy's testimony persuasive that the broadest reasonable interpretation of "application program" by one of ordinary skill in the art at the time of the invention is defined by "commonly shared features" of examples of computer programs in the patent specification.  *See* PO Resp. 11–16 (citing Ex. 2003 ¶¶ 42–44).  Construing "application program" as Patent Owner suggests improperly limits the claim term to the embodiments and examples in the '854 patent specification and imports negative limitations unsupported by the intrinsic evidence.

10

IPR2014-00207
Patent 7,496,854 B2

Patent Owner has not shown that the broadest reasonable construction of "application program" excludes subsidiary programs. *See* PO Resp. 11–16; Reply 6–10. On the full record, we determine that "application program" is construed as an independent executable program.

### B. Unpatentability Based on Domini (Ex. 1007)

Petitioner contends that Domini anticipates claims 1–12, 36–38, 40–45, and 49 under 35 U.S.C. § 102(e). Pet. 31–39.

### 1. Domini (Ex. 1007)

Domini discloses identifying and correcting spelling and grammar errors in a document created by a word processing program. Ex. 1007, Abstract, 4:65–5:11. Figure 1, below, shows an embodiment of the invention. *Id*. at 4:39–41.



FIG.1

Figure 1 depicts personal computer 10 connected by networks 12 and 13 to remote computer 11. *Id*. at 7:13–16. Domini discloses that "[t]hose skilled in the art will understand that program modules such as an operating system 36, application

11

IPR2014-00207
Patent 7,496,854 B2

programs 37, and data are provided to the personal computer 10." *Id*. at 7:41–43. Thus, personal computer 10 and remote computer 11 contain program modules, such as operating system 36, application programs 37. *Id*. at 6:33–42, 7:41–44. Domini states further that:

> [t]he *application programs* 37 may include a number of different programs such as a word processing program 37a, a *spell checker program 37b*, and a grammar checker program 37c. In the preferred personal computer 10, the local hard disk drive 20 is used to store data and programs, including the operating system and programs.

*Id*. at 7:46–52 (emphasis added).

In the spelling and grammar programs disclosed in Domini, the user selects the "Spelling and Grammar" command to initialize the spell check program. *Id*. at 16:13–16. Without user intervention, the spell check program identifies misspelled words and presents them in red, bold typeface. *Id*. at 17:27–33, 4:12–16. The spell check program also displays a list of suggested corrections that may be selected and entered into the document by the user. *Id*. at 1:42–44, 12:1–5, 12:61–64.

### 2. Anticipation based on Domini (Ex. 1007)
#### a. "application program"

Patent Owner argues that the spell checker program in Domini is a "module" operating under the control of the first application program and fails to disclose the "second application program" as recited in claims 1–12, 36–38, 40–45, and 49. PO Resp. 30–35.

Patent Owner's arguments and analysis are based on its proposed claim interpretation that excludes subsidiary programs from "application program" as recited in the challenged claims. PO Resp. 30–31 (contrasting subsidiary programs with application programs and stating that it "would be understood by one of

12

ordinary skill in the art at the time of the invention, an 'application program' is an 'independently executable program' that is independent of and not under the control of another program." (citing Ex. 2003 ¶¶ 42–48)). As discussed above, we do not construe "application program" to exclude subsidiary programs based on characteristics of the example programs in the '854 patent specification. *See* Section II.A.3, *supra*. Accordingly, we are not persuaded by Patent Owner's arguments and testimony of Dr. Levy that the program modules in Domini that are explicitly identified as "application programs" do not meet the claim limitation for "application program." PO Resp. 30–35. Dr. Levy's narrow interpretation of application program reads limitations into the claim (PO Resp. 30), that are not supported by the '854 specification. *See* Reply 8–9 (citing Ex. 1001, 7:25–8:7).

Patent Owner's argument that one of ordinary skill in the art would have understood spell checker program 37b to be a program module (PO Resp. 30–31) and not an application program—as it is expressly described—is not supported by a plain reading of the Domini disclosure. Patent Owner's arguments and evidence fail to address the term "application program" as it is used in Domini and show that it differs from the "application program" as recited in the challenged claims. Indeed, Dr. Levy has not provided testimony that the term "application program" as used in Domini (Ex. 1007, 7:41–52, Fig. 1) differs from or is inconsistent with "application program" as recited in the challenged claims. *See* Tr. 35:13–20 (stating that Patent Owner's expert found Domini consistent with Patent Owner's construction).

With respect to application programs in Domini, Patent Owner concedes that Domini discloses stand-alone spell checkers (PO Resp. 35–36 (citing Ex. 1007, 1:56–2:26; Ex. 2003 ¶ 24)), but argues that "a stand-alone spell checker would not be capable of inserting text into a word processor" (PO Resp. 36 (citing Ex. 2003

13

IPR2014-00207
Patent 7,496,854 B2

¶¶ 24–25, 35)). We agree with Petitioner (Reply 11), however, that Domini discloses incorporating changes into a document by replacing words in the word processing document. Ex. 1007, 12:59–13:31, 14:42–67.

We disagree with Patent Owner's narrow interpretation of the term "application program" that excludes spell checker program 37b explicitly disclosed in Domini (Ex. 1007, 7:46–52). PO Resp. 25–29. We find that spell checker program 37b and other application programs in Domini disclose the "application program" recited in the challenged claims. Based on the complete record, we find that Domini discloses an "application program." Based on the complete record and in light of Patent Owner's and Petitioner's arguments and evidence, we find, by a preponderance of the evidence, that Domini discloses an "application program" as recited in the challenged claims.

### b. "the second information associated with the first information from the second application program"

Patent Owner's argument that Domini fails to disclose "the second information associated with the first information from the second application program" is based on its claim construction that "associated' requires a pre-existing relationship between the first and second information. PO Resp. 37–39. Because we determined previously that "associated" is construed as "connected or related" (Section II.A.2, *supra*), we are not persuaded by Patent Owner's argument. Patent Owner's argument that Domini does not disclose a pre-existing relationship, "such as the relationship between field entries of a database record" (PO Resp. 37) is premised on an overly narrow interpretation of the claim term that is not commensurate in scope with the challenged claims.

14

IPR2014-00207
Patent 7,496,854 B2

### c. searching in response to a user selection

Patent Owner contends that dependent claims 3, 9, 38, and 45, require that searching for second information is initiated or prompted by a user selection. PO Resp. 39–40. Claim 1 of the '854 patent recites "responding to a user selection by inserting a second information into the document." Claim 3, which depends from claim 1, requires that "the step of inserting further comprises: searching using the second application, for the second information associated with the first information and retrieving the second information." Patent Owner argues that Petitioner has failed to show that Domini discloses searching as a result of a user selection, because the suggested substitute terms for insertion are already obtained when the user makes the selection. PO Resp. 40–41 (citing Pet. 31–32).

Petitioner responds that Patent Owner's interpretation of the claim limitation is improper as it excludes disclosed embodiments of the '854 invention. Reply 13 (citing Ex. 1001, Fig. 1, 4:46–50). Petitioner argues that claims 3, 9, 38, and 45 "simply state that *insertion* must be done in response to user selection" and "[t]here is no required ordering between searching and user selection to insert." Reply 13–14.

Based on the record, we are not persuaded the Petitioner has shown by a preponderance of the evidence that the searching steps of claims 3, 9, 38, and 45, occur in response to a user selection. Dependent claims 3, 9, 38, and 45, and the claims that depend therefrom, provide additional limitations on the insertion step that takes place in response to a user's selection. The evidence cited by Petitioner refers only to insertion of the already retrieved suggestions. *See* Pet. 31–36 (claim chart showing claims 3, 9 and 38 and applying same analysis to claim 45). Accordingly, we find that Petitioner has not shown by a preponderance of the

15

IPR2014-00207
Patent 7,496,854 B2

evidence that dependent claims 3–5, 9–11, 38, 40, 41, and 45 are anticipated by Domini.

### d. Conclusion

Based on the complete record and the evidence and argument presented by Petitioner and Patent Owner, we find, by a preponderance of the evidence, that Domini anticipates claims 1, 2, 6–8, 12, 36, 37, 42–44, and 49. Petitioner has not shown by a preponderance of the evidence that Domini anticipates claims 3–5, 9–11, 38, 40, 41, and 45.

### C. Unpatentability Based on Hachamovitch (Ex. 1008)

Petitioner contends that Hachamovitch anticipates claims 1–12 and 36–49 under 35 U.S.C. § 102(e). Pet. 40–45. In addition, Petitioner contends that claims 3–5, 9–11, 38–41, and 45–48 are obvious under 35 U.S.C. § 103(a) in view of Hachamovitch. Pet. 45–49.

### 1. Hachamovitch (Ex. 1008)

Hachamovitch discloses a word completion utility that automatically predicts word completion for data entry in a data file, such as a word processor or email application. Ex. 1008, 4:10–13. The word completion system is used in conjunction with an individual application program or operates independently across multiple application programs. *Id*. at 4:21–25. The user's partially typed word is compared to the name-completion pairs and if a match is found within the list a suggestion list will be presented to a user. *Id*. at 4:58–5:6. A suggested word is presented to the user in a pop-up user interface within a word processing application as shown in Figs. 2A and 2B below.

16

IPR2014-00207
Patent 7,496,854 B2



Figure 2A illustrates a word completion suggestion where the name completion pair is tied to a date or system parameter. *Id*. at 10:18-21; 10: 57-61. Figure 2B illustrates a word completion suggestion where the name-completion pair is tied to predefined properties, such as an initial capitalized letter. *Id*. at 11: 4-14. Once a word completion is displayed, the user may accept the word completion using an acceptance keystroke (e.g. tab or enter). Once accepted, the word completion utility replaces the partial data entry with the completion entry in the data file. *Id*. at 5:7-10; 7:4-5.

### 2. *Anticipation Based on Hachamovitch (Ex. 1008)*

Petitioner argues that Hachamovitch fails to disclose or teach a "second application program" as recited in independent claims 1, 7, 36, and 43, because the word completion utility is a subsidiary program that cannot be used independently of the host application. PO Resp. 41–42 (citing Ex. 1008, Fig. 1; Ex. 2003 ¶¶ 27–29). Patent Owner's arguments are based on its proposed claim interpretation that excludes subsidiary programs from the "second application program" recited in the challenged claims. PO Resp. 41–44. As discussed above, we disagree that the

17

IPR2014-00207
Patent 7,496,854 B2

construction of application program excludes subsidiary programs that are deployed within other applications or synchronously accessed by multiple applications. *See* Section II.A.3, *supra*.

Based on the record, we find that Petitioner has shown that Hachamovitch discloses that the word completion utility can be deployed as a "stand-alone" "application-independent" utility. Pet. 38 (Ex. 1008, 7:65–8:5). Hachamovitch states that "[t]o deploy the word completion system as an application-independent utility, an interface is defined within each application program through which the word completion utility may communicate with each application program." Ex. 1008, 8:6–9. Although the utility described in Hachamovitch operates through the application program, the reference expressly states that the utility can be part of the application program or operates independent of the applications as a "stand-alone" utility. Ex. 1008, 7:65–8:5. We find that the preponderance of the evidence indicates that "stand-alone" utility in Hachamovitch is an "application program" as recited in the claims.

We have reviewed Petitioner and Patent Owner's argument and evidence. We find that Petitioner has shown by a preponderance of the evidence that Hachamovitch anticipates claims 1–12 and 36–49. In addition, Petitioner has shown by a preponderance of the evidence that claims 3–5, 9–11, 38–41, and 45–48 are obvious in view of Hachamovitch.

### D. *Patent Owner's Motion to Exclude Evidence*

Patent Owner moves to exclude the deposition transcript of Petitioner's expert, Dr. Daniel A. Menascé, Exhibit 1014. Paper 23. Dr. Menascé was deposed by Patent Owner's counsel on August 7, 2014 for this proceeding and for proceedings IPR2014-00206 and IPR2014-00207. Ex. 1014, 1. Patent Owner

IPR2014-00207
Patent 7,496,854 B2

contends the Menascé transcript is irrelevant and improper supplemental information that is not submitted in compliance with 37 C.F.R. § 42.123.  Paper 22, 9–12.

With respect to Exhibit 1014, Petitioner argues and we agree that 37 C.F.R. § 42.53(f)(7) states that deposition testimony must be filed by its proponent as an exhibit.  Paper 26, 3–4.  Consistent with Petitioner's position, the rule recently has been clarified.  *See* Amendments to the Rules of Practice for Trials Before the Patent Trial and Appeal Board, 80 Fed. Reg. 28,561, 28,563 (May 19, 2015) ("To clarify that either party is permitted to file testimony as an exhibit, the Office amends 37 CFR 42.53(f)(7) to delete the phrase 'by proponent' in the second sentence.").  Because either party is permitted to file testimony as an exhibit, Petitioner's filing of the exhibit is proper.  Accordingly, we *deny* Patent Owner's motion to exclude Exhibit 1014, the deposition transcript of Petitioner's expert, Dr. Daniel A. Menascé.

Patent Owner also seeks to exclude "Exhibit 1015," Visual Studio 2012 ("VS2012"), filed as an attachment to the deposition transcript of John V. Levy, Ph.D. (Ex. 1013).[2]  Paper 23, 4–8.  Patent Owner implicitly acknowledges that Petitioner's Reply to Patent Owner's Response does not expressly discuss or rely on VS2012.  Paper 23, 5.  Because we do not consider or rely on VS2012, or the portion of Dr. Levy's testimony discussing VS2012, in reaching our determinations in this Decision, Patent Owner's motion to exclude "Exhibit 1015" of Exhibit 1013 is *dismissed* as moot.

---

[2] Although the attachment is labelled "Exhibit 1015," VS2012 was not entered into the file as Exhibit 1015.

19

IPR2014-00207
Patent 7,496,854 B2

III.    CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–12 and 36–49 are unpatentable based on the following grounds of unpatentability:

(1) Claims 1, 2, 6–8 12, 36, 37, 42–44, and 49 under 35 U.S.C. § 102(e) as anticipated by Domini;

(2) Claims 1–12 and 36–49 under 35 U.S.C. § 102(e) as anticipated by Hachamovitch;

(3) Claims 3–5, 9–11, 38–41, and 45–48 under 35 U.S.C. § 103(a) for obviousness over Hachamovitch.

IV.    ORDER

For the reasons given, it is

ORDERED that, based on a preponderance of the evidence, claims 1–12 and 36–49  of U.S. Patent No. 7,496,854 B2 are held unpatentable; and

FURTHER ORDERED that Patent Owner's motion to exclude "Exhibit 1015" is *dismissed*, and the motion to exclude Exhibit 1014, the deposition transcript of Dr. Daniel A. Menascé, is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

20

IPR2014-00207
Patent 7,496,854 B2


For Petitioner:

David L. Fehrman
dfehrman@mofo.com

Mehran Arjomand
marjomand@mofo.com

Matthew A. Smith
smith@turnerboyd.com

Zhuanjia Glu
gu@turnerboyd.com


For Patent Owner:

Robert Asher
rasher@sunsteinlaw.com

Bruce Sunstein
bsunstein@sunsteinlaw.com

21



US007496854B2

(12) **United States Patent**

Hedloy

(10) **Patent No.:** **US 7,496,854 B2**

(45) **Date of Patent:** **Feb. 24, 2009**

(54) **METHOD, SYSTEM AND COMPUTER READABLE MEDIUM FOR ADDRESSING HANDLING FROM A COMPUTER PROGRAM**

(75) Inventor: **Atle Hedloy**, Stabekk (NO)

(73) Assignee: **Arendi Holding Limited**, Grand Cayman (KY)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 20 days.

(21) Appl. No.: **09/923,134**

(22) Filed: **Aug. 6, 2001**

(65) **Prior Publication Data**

US 2002/0054092 A1      May 9, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/189,626, filed on Nov. 10, 1998, now Pat. No. 6,323,853.

(51) **Int. Cl.**
*G06F 3/00* (2006.01)

(52) **U.S. Cl.** ...................................... **715/780**; 715/816

(58) **Field of Classification Search** ................. 345/700, 345/705, 710, 744, 764, 804, 805, 808, 809, 345/835, 840, 853, 968; 707/1, 3, 500, 501.1, 707/505, 507, 513, 515, 530; 715/500, 501.1, 715/505, 507, 513, 515, 530, 780, 816

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,674,065 A      6/1987  Lange et al.

(Continued)

FOREIGN PATENT DOCUMENTS

EP      0 093 250 A2      9/1983

(Continued)

OTHER PUBLICATIONS

User Manual For AddressMate and AddressMate Plus 1994-1995 by AddressMate Software.

(Continued)

*Primary Examiner*—Sy D. Luu

(74) *Attorney, Agent, or Firm*—Cesari and McKenna, LLP

(57) **ABSTRACT**

A method, system and computer readable medium for providing for providing a function item, such as a key, button, icon, or menu, tied to a user operation in a computer, whereby a single click on the function item in a window or program on a computer screen, or one single selection in a menu in a program, initiates retrieval of name and addresses and/or other person or company related information, while the user works simultaneously in another program, e.g., a word processor. The click on the function item initiates a program connected to the button to search a database or file available on or through the computer, containing the person, company or address related data, in order to look up data corresponding to what the user types, or partly typed, e.g., name and/or address in the word processor, the correct data from the database, data related to the typed data, e.g., the name of the person, company, or the traditional or electronic address, or other person, or company, or address related data, and alternatively the persons, companies, or addresses, are displayed and possibly entered into the word processor, if such related data exists.

**101 Claims, 14 Drawing Sheets**



Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 1

**US 7,496,854 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,226,117 A | | 7/1993 | Miklos ........................ 345/853 |
| 5,267,155 A | | 11/1993 | Buchanan et al. |
| 5,331,555 A | | 7/1994 | Hashimoto et al. .......... 707/531 |
| 5,375,200 A | * | 12/1994 | Dugan et al. ................ 345/804 |
| 5,392,386 A | | 2/1995 | Chalas |
| 5,416,901 A | | 5/1995 | Torres ........................ 345/835 |
| 5,491,783 A | | 2/1996 | Douglas et al. ............. 345/846 |
| 5,491,784 A | | 2/1996 | Douglas et al. ............. 345/810 |
| 5,500,859 A | | 3/1996 | Sharma et al. ............. 370/468 |
| 5,530,853 A | | 6/1996 | Schell et al. ................. 707/1 |
| 5,546,447 A | | 8/1996 | Skarbo et al. ...... 379/142.05 |
| 5,576,955 A | | 11/1996 | Newbold et al. |
| 5,606,712 A | | 2/1997 | Hidaka ....................... 712/1 |
| 5,640,565 A | | 6/1997 | Dickinson .............. 707/103 R |
| 5,666,502 A | | 9/1997 | Capps ........................ 345/811 |
| 5,708,804 A | | 1/1998 | Goodwin et al. ............. 707/3 |
| 5,724,597 A | | 3/1998 | Cuthbertson et al. ........ 707/531 |
| 5,732,229 A | | 3/1998 | Dickinson ................... 345/764 |
| 5,761,656 A | | 6/1998 | Ben-Shachar ................ 707/4 |
| 5,781,189 A | | 7/1998 | Holleran et al. ............ 345/826 |
| 5,793,972 A | | 8/1998 | Shane ........................ 709/219 |
| 5,794,228 A | | 8/1998 | French et al. |
| 5,794,259 A | | 8/1998 | Kikinis ....................... 707/507 |
| 5,799,302 A | | 8/1998 | Johnson et al. ............... 707/7 |
| 5,805,886 A | | 9/1998 | Skarbo et al. .............. 709/318 |
| 5,815,830 A | | 9/1998 | Anthony |
| 5,826,257 A | | 10/1998 | Snelling, Jr. ................. 707/4 |
| 5,835,089 A | | 11/1998 | Skarbo et al. .............. 345/751 |
| 5,859,636 A | | 1/1999 | Pandit ................... 707/501.1 |
| 5,864,848 A | | 1/1999 | Horvitz et al. |
| 5,873,107 A | | 2/1999 | Borovoy et al. .......... 707/501.1 |
| 5,884,309 A | | 3/1999 | Vanechanos, Jr. ........... 707/10 |
| 5,893,093 A | | 4/1999 | Wills ............................ 707/3 |
| 5,896,533 A | | 4/1999 | Ramos et al. ............... 709/217 |
| 5,907,838 A | | 5/1999 | Miyasaka et al. ............. 707/4 |
| 5,913,214 A | | 6/1999 | Madnick et al. ............. 707/10 |
| 5,924,090 A | | 7/1999 | Krellenstein ................ 707/5 |
| 5,926,808 A | | 7/1999 | Evans et al. ................... 707/3 |
| 5,930,471 A | | 7/1999 | Milewski et al. .......... 709/204 |
| 5,946,647 A | | 8/1999 | Miller et al. |
| 5,999,938 A | | 12/1999 | Bliss et al. |
| 6,006,218 A | | 12/1999 | Breese et al. |
| 6,021,403 A | | 2/2000 | Horvitx et al. |
| 6,026,398 A | | 2/2000 | Brown et al. ................. 707/5 |
| 6,067,565 A | | 5/2000 | Horvitz |
| 6,085,201 A | | 7/2000 | Tso ............................ 707/505 |
| 6,085,226 A | | 7/2000 | Horvitz |
| 6,182,133 B1 | | 1/2001 | Horvitz |
| 6,223,570 B1 | | 5/2001 | Horvitz et al. |
| 6,260,035 B1 | | 7/2001 | Horvitz et al. |
| 6,262,730 B1 | | 7/2001 | Horvitz et al. |
| 6,323,853 B1 | * | 11/2001 | Hedloy ....................... 345/810 |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0093250 | 11/1983 |

## OTHER PUBLICATIONS

Microsoft Word 97 Help File entitled "Automatically check spelling and grammar as you type".

Microsoft Word 97 Help File entitled "Turn automatic changes on or off".

Microsoft Word 97 Help File entitled "Automatically correct text".

Microsoft Word 97 Help File entitled "Field Codes: Hyperlink Field".

Microsoft Word 97 Help File entitled "Change the contents of an AutoCorrect entry".

Wood, Andrew, et al., CyberDesk: Automated Integration of Desktop and Network Services, GVU Technical Report, OIT-GVU-97-11, May 1997.

Gregory D. Abowd, Anidn Dey and Andy M. Wood, Applying Dynamic Integration as a Software Infrastructure for Context-Aware Computing, GVU Technical Report, GIT-GVU-97-18, Sep. 1997.

Gregory D. Abowd, Anind Dey, Robert Orr and Jason Brotherson, Context-awareness in wearable and ubiquitous computing, GVU Technical Report, GIT-GVU-97-11, Mar. 1997.

Apple Data Detectors User's Manual, Jul. 1, 1997.

Apple Internet Address Detector User's Manual, Aug. 28, 1997.

Apple Introduces Internet Address Detectors, Sep. 8, 1997.

Contextual Menu Manager/Apple Data Detectors.

CoStar User Manual for AddressMate and AddressMate Plus.

Ctags (UNIX Command).

Anind K. Dey and Gregory D. Abowd, CyberDesk: The Use of Perception in Context-Aware Computing, PUI Workshop Submission, Proc. of 1997 Workshop on Perceptual User Interfaces (PUI '97), pp. 26-27, Oct. 1997.

Anind K. Dey, Context-Aware Computing: The CyberDesk Project, Future Computing Environments, AAAI '98 Spring Symposium, Stanford University, pp. 51-55, Mar. 23-25, 1998.

Anind K. Dey, Gregory D. Abowd and Andrew Wood, CyberDesk: a framework for providing self-integrating context-aware services, Knowledge-Based Systems, vol. 11, No. 1, pp. 3-13, Sep. 1998.

Anind K. Dey, Gregory D. Abowd, Mike Pinkerton and Andrew Wood, CyberDesk: A Framework for Providing Self-Integrating Ubiquitous Software Services, GVU Technical Report, GIT-GVU-97-10, May 1997.

L. Nancy Garrett, Karen E. Smith and Norman Meyrowitz, Intermedia: Issues, Strategies, and Tactics in the Design of a Hypermedia Document System, (c) 1986, pp. 163-174.

Eve Wilson, Links and Structures in hypertext databases for law, Proceedings of the First European Conference on Hypertext, INRIA, Nov. 1990.

Mike Langberg, 'Innovation is at the heart of what we do', Apple breaks new ground by displaying what's on its drawing board, Mercury News, Aug. 7, 1996, pp. 1-2.

Henry Lieberman, Bonnie A . Nardi and David Wright, Training Agents to Recognize Text by Example, Proc. of the Third4Annual Conference on Autonomous Agents, Seattle, WA, pp. 116-122, 1999.

User's Guide, Microsoft Word 6.0, for Windows and Macintosh.

Bonnie A. Nardi, James R. Miller and David J. Wright, Collaborative, Programmable Intelligent Agents, Website, Mar. 1998, pp. 1-11.

Milind S, Pandit and Sameer Kalbag, The Selection Recognition Agent: Instance Access to Relevant Information and Operations, Proc. of Intelligent User Interfaces 1997, Orlando, FL, 1997.

Spell, iSpell Spellout.

WikiWikiWeb.

United States Court of Appeals for the Federal Circuit, Appeal From the United States District Court for the District of Rhode Island in Case No. 02-CV-343, Judge Ernest C. Torres. Brief for Defendant-Cross Appellant Frank E. Scherkenbach Jul. 7, 2005.

United States District Court for the District of Rhode Island, 02-CV-343 (ECT) Defendant Microsoft Corporation's Motion for Judgement as a Matter of Law That the '853 Patent is Invalid, Oct. 15, 2004.

United States District Court of Rhode Island, CIV. A. No. 02-CV-343 (ECT), Plaintiffs' Reply Memorandum in Support of Their Motion for New Trial.Francis A. Connor. Nov. 4, 2004.

United States Court of Appeals Federal Circuit, Brief for Plaintiff-Appellant, Frank E. Scherkenbach, Sep. 2, 2005.

United States District Court for the District of Rhode Island 02-CV-343 (ECT). Memorandum in Support of Defendant Microsoft Corporation's Opposition to Arendi's Motion for a New Trial. Patricia A. Sullivan, Oct. 27, 2004.

United States Court of Appeals for the Federal Circuit, Appeal From the United States District Court for the District of Rhode Island in Case No. 02-CV-343, Brief of Plaintiffs-Appellants Arendi U.S.A., Inc. and Arend Holding Limited. Donald R. Dunner, Apr. 25, 2005.

United States Court of Appeals for the Federal Circuit, Appeal From the United States District Court for the District of Rhode Island in Case No. 02-CV-343, Reply Brief for Defendant-Cross Appellant. Frank E. Scherkenbach, Oct. 3, 2005.

United States District Court for the District of Rhode Island, Order Denying Defendant Microsoft Corporation's Motion for Judgment as

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 2

**US 7,496,854 B2**

Page 3

a Matter of Law That the '853 Patent is Invalid, C.A. No. 02-343T. Ernest C. Torres, Chief Judge, Nov. 30, 2004.

United States District Court for the District of Rhode Island. C.A. 02-343T. Order Denying Plaintiffs' Motion for New Trial. Ernest C. Torres, Chief Judge, Nov. 30, 2004.

Addressmate Automatic Envelope Addressing Program, User's Manual, 1991.

Peter Brown, Unix Guide, 1995.

N.D. Beitner, et al, Multimedia Support and Authoring in Microcosm: an extended model.

Lee E. McMahon, SED—A Non-interactive Text Editor, Bell Laboratories, Aug. 15, 1978.

SED(1), BSD Reference Manual Page.

AddressMate for Windows, Version 2.0, Product Box and License Agreement.

AddressMate Incorpoates Correction Capability, The New York Law Publishing Company, Jan. 1996.

Lawrence J. Magid, Addressing the Matter of Labels, Los Angeles Times, Sep. 23, 1996.

Mar. 1996 Reviews, website available at www.techweb.com/winmap/library/1996/0396/03rvh002.htm.

Important Note for New AddressMate Users.

Important Tips for LabelWriter Owners Using AddressMate.

Adressing the Issues, Jun. 24, 1993.

AddressMate Advertisement "Whye Do it the Olde Way".

Philip Robinson, The Envelope, Please: It's AddressMate, San Jose Mercury News, Sunday, Jul. 19, 1992.

Steve Supkoff, AddressMate, PCM, Aug. 1992.

L.R. Shannon, Addressing Envelopes, The New York Times, Tuesday, Jul. 14, 1992.

Rob Schwabach, Addressing for Success, On Computers column, Mar. 16, 1992.

INFOWORLD, p. 15, Mar. 16, 1992.

Ken Hart, Simplify Envelope Printing with AddressMate, Computer Shopper.

Colvin's beta-testing of Addressmate sparks developer's appreciation, Westview, Apr. 6, 1992.

Press Release:AddressMate Software Automatically Addresses and bar Codes Envelopes to Save Time and money, Mar. 9, 1992.

Gearoge M> Long, Letter to Mr. David Block, Nov. 11, 1994.

Philip J. Damiano, Letter to Mr. David Block, Jan. 5, 1994.

AddressMate for Windows, Advertisement.

AddressMate Plus, Advertisement.

Ed Kahn, Envelope Addressing Finally Simplified AddressMate Does Addressing and Much More, Microtimes, Nov. 27, 1995.

Kirsten Bernthal, LabelWriter XI. Plus, PC Catalog, Aug. 18, 1995.

David Plotkin, Address for Success, Bay Area Computer Currents, p. 36-38, Mar. 21, 1995.

Address Fixer for Microsoft Word and office, Product Box.

AddressMate Plus, Product Box and License Agreement.

Getting Results with Microsoft Office for Windows 95, Version 7.0, 1995.

Getting Results with Microsoft Office 97, copyright 1995-1997.

Microsoft Word, User's Guide, Verison 6.0, copyright 1993-1994.

Apple Internet Address Detectors User's Manual, copyright 1997.

CTAGS(1) Manual Page.

Eve Wilson, Links and Structures in Hypertext Databases for Law, in Hypertext: Concepts, Systems and Applications, Proceedings of the First European Conference opn Hypertext, Nov. 1990.

Matt Bernstein, An Apprentice that Discovers Hypertext Links.

Contextual Menu Manager/Apple Data Detectors.

Eve Wilson, Guiding Lawyers: Mapping Law into Hypertext, Artificial Intelligence Review 6, pp. 161-189, 1992.

P.J. Brown et al, A Help System Based on UNIX Man Pages.

Charles H. Franke III et al, Authoring a Hypertext Unix Help Manual, 1995.

P.J. Brown, Guide User Manual, 1985, sixteenth impression, Apr. 1995.

E. Wilson, Cases for Justus: Preparing a Case Database for a Hypertext Information Retrieval System, Literary and Linguistic COmputing, vol. 5, No. 2, 1990.

John Robertson, et al, The Hypermedia Authoring Research Toolkit, ECHT 194 proceedings, pp. 177-185.

Mike Langberg, Apple Breaks New Ground by Displaying What on its drawing board, Aug. 7, 1996.

What is Wiki and Wiki History webpages, available at wiki.org/wiki.cgi?WhatIsWiki and www.c2.org/cgi/wiki?WikiHistory.

E.Wilson, Integrated Information Retrieval for Law in a Hypertext Environment, Annual ACM Conference on Research and Development in information Retrieval, 1988.

Multimedia Hyperlinks Automatically Created for Reference Documents, Research Disclosure, Jun. 1993.

Wiki Wiki Origin.

Joy-Lyn Blak, WikiWikiWeb, Computer World, Jan. 29, 2001.

Microsoft's Supplemental Responses to Arendi's Interrogatories, in Arendi U.S.A. et al v. Microsoft Corporation, Civil Action 02-CV-343 (ECT) from United States District Court for the District of Rhode Island.

Apple Introduces Internet Address Detectors, Press Release, Sep. 7, 1997.

Cara Cunningham, Apple Kicks Off Macworld with talk of revival, new software demos, InfoWorld Electric, Aug. 7, 1996.

James Staten, Apple Looks to the Future, MacWeek, Aug. 7, 1996.

Mark Simmons, Striking a Key Note, Mac Addict Online, Aug. 8, 1996.

Jim Miller, email regarding Apple Data Detectors, Jan. 8, 1997.

Apple Data Detectors web page, Jan. 6, 1997.

Apple Data Detectors—Now Shipping web page, Jan. 6, 1997.

The Apple Data Detectors FAQ, Jan. 6, 1997.

Apple Data Detector Webpages, available on web.archive.org/web/20020601164217/www.apple.com/applescript/data_detectors.

Apple Data Detectors 1.0.2 Read Me.

Developer's Guide to Apple Data Detectors, Dec. 1, 1997.

AppleScript Editors, Utilities & Environments, available at www.applescriptsourcebook.com/links/applescripteditors.html, dated Jan. 11, 2004.

eMailman Internet Address Detectors.

Steve Tannehill, News from Jul. 1997.

Contol-Click! The Archive.

Contextual Menus: One of System 8's Greatest Features, in ApplePress.

Contextual Menu Manager/Apple Data Detectors, available at web.archive.org/web/20020803063750/www.macemail.com/emailer/CEMH/contextual.shtml.

Trygve's CMM Plug-Ins Homer, available at web.archive.org/web/19980130053511/www.bombaydigital.com/cmms.

ADD Depot, available from web.archive/web/20000819091818/http://homepage.mac.com/mathewmiller/add.

Press Release: Apple Introduces Internet Address Detectors, Sep. 8, 1997.

MacWEEK Report, Aug. 8, 1996.

Mike Langber, Show of Potential Apple Breaks New Ground By Displaying What's on Its Drawing Board 'Innovation is at the heart of what we do', in San Jose Mercury News, Aug. 7, 1996, p. 1C.

Apple Introduces Internet Address Detectors, Newsbytes, Sep. 29, 1997.

Greg Williams, Strategy Mosaic: Understanding Apple's Dual OS Strategy.

Taking [control] of your Mac with System 8, The MacAuthority, Jan. 1998.

Apple Data Detectors 1.0.2, TidBITS Updates, Mar. 8, 1998.

Apple Data Detectors 1.0.2, TidBITS #419, Mar. 9, 1998.

Tonya Engst, More Context on Contexual menus, TidBITS #399, Sep. 29, 1997.

Tonya Engst, Of Mice and Menus, TidBITS #398, Sep. 22, 1997.

Charles Whaley, Will this be enough to kick-start Apple?, Computing Canada, Aug. 4, 1997.

MacOS8.com—Mac OS 8 Indepth.

A Farewell to the Apple Advanced Technology Group, SIGCHI, vol. 30, No. 2, Apr. 1998.

James R. Miller and Thomas Bonura, From Documents to Objects, in SIGCHI, vol. 30, No. 2, Apr. 1998.

Thomas Bonura and James R. Miller, Drop Zones, in SIGCHI, vol. 30, No. 2, Apr. 1998.

Bonnie A. Nardi, et al., Collaborative, Programmable Intelligent Agents, Communicaitons of the ACM, vol. 41, No. 3, Mar. 1998.

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 3

## US 7,496,854 B2
Page 4

Novell GroupWise User's Guide for Windows 16-BIT, Version 5.2, 1993, MS 125993, Novell, Inc., Orem, Utah.

Novell GroupWise Webaccess User's Guide, 1998, MS 126785, Novell, Inc., Orem, Utah.

Novell GroupWise User's Guide For Windows 32-BIT, 1998, MS 126463, Novell, Inc., Orem, Utah.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from 2:00pm Sep. 13, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 14, 2004, Providence RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 15, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 16, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 17, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 20, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 21, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 22, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 23, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation:, et al.* C.A. No. 02-343T Court Transcript from Sep. 27, 2004, Providence, RI.

*Arendi USA, Inc., et al.* vs. *Microsoft Corporation, et al.* C.A. No. 02-343T Court Transcript from Sep. 28, 2004, Proovidence, RI.

* cited by examiner

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 4



ONE BUTTON CONTACT AND ADDRESS INVENTION FLOW CHART
IN PRINCIPLE: EXACT IMPLEMENTATION MAY VARY
DATABASE INTERACTION
START USER HITS BUTTON IN WORD PROCESSOR
2
ANALYZE WHAT THE USER HAS TYPED IN THE DOCUMENT
4
WHAT DATA DID WE FIND?
6
NOTHING OR NOT INTERPRETABLE
GIVE MESSAGE AND QUIT
8
EMAIL ADDRESS MAILING LIST/CATEGORY NAME, TEL. NO. OR OTHER
APPROPRIATE ACTION (NOT DISPLAYED HERE)
10
NAME ONLY (OR SIMILAR)
LOOK UP NAME IN DATABASE
12
FIND IT?
18
NO
PROMPT USER TO SPECIFY ADDRESS
24
FOUND ONE MATCH EXACTLY, I.E. ONE CONTACT WITH ONE ADDRESS
INSERT CORRECT ADDRESS AND NAME IN DOCUMENT
22
FOUND MORE THAN ONE POSSIBLE CONTACT/ADDRESS MATCH
DISPLAY CHOICES TO USER AND LET HIM CHOOSE ADDRESS
20
QUIT
16
NAME AND ADDRESS
LOOK UP NAME IN DATABASE
14
FIND IT?
26
FOUND NAME AND ADDRESS
NO ACTION, OR DISPLAY DATA FOR USER EDIT
32
FOUND NO MATCH
FOUND NAME, NOT ADDRESS
PROMPT USER FOR DECISION AND REVIEW
30
THIS IS A ONE-TIME OCCURRENCE: NO ACTION
THIS IS ANOTHER CONTACT WITH SAME NAME
INSERT ADDRESS AND NAME (POSSIBLY CORRECTED BY USER) IN DATABASE
28
THE CONTACT HAS MOVED, THIS IS THE NEW ADDRESS
REPLACE (ONE OF THE) OLD ADDRESS(ES) FOR THE CONTACT WITH THE NEW ONE
34
THIS IS ADDITIONAL ADDRESS FOR THIS CONTACT
INSERT ADDRESS IN DATABASE FOR CONTACT
36

FIG. 1



ONE BUTTON CONTACT AND ADDRESS INVENTION FLOW CHART IN PRINCIPLE: EXACT IMPLEMENTATION MAY VARY
DATABASE INTERACTION
START USER HITS BUTTON IN WORD PROCESSOR
2
ANALYZE WHAT THE USER HAS TYPED IN THE DOCUMENT
4
WHAT DATA DID WE FIND?
6
NOTHING OR NOT INTERPRETABLE
GIVE MESSAGE AND QUIT
8
EMAIL ADDRESS MAILING LIST/ CATEGORY NAME, TEL. NO. OR OTHER
APPROPRIATE ACTION (NOT DISPLAYED HERE)
10
NAME ONLY, (OR SIMILAR)
LOOK UP NAME IN DATABASE
12
FIND IT?
18
FOUND MORE THAN ONE POSSIBLE CONTACT/ADDRESS MATCH
DISPLAY CHOICES TO USER AND LET HIM CHOOSE ADDRESS
20
USER DECISION: INSERT SELECTED ADDRESS IN DOCUMENT?
21
YES
NO
FOUND ONE MATCH EXACTLY, i.e. ONE CONTACT WITH ONE ADDRESS
INSERT CORRECT ADDRESS AND NAME IN DOCUMENT
22
QUIT
16
NO
PROMPT USER TO SPECIFY ADDRESS
24
NAME AND ADDRESS
LOOK UP NAME IN DATABASE
14
FIND IT?
26
DID NOT FIND NAME
PROMPT USER FOR DECISION AND REVIEW INSERT CONTACT AND ADDRESS?
27
YES
NO
INSERT ADDRESS AND NAME (POSSIBLY CORRECTED BY USER) IN DATABASE
28
FOUND NAME NOT ADDRESS
LOOK UP IN DATABASE
29
DOES THIS CONTACT HAVE ANOTHER ADDRESS?
31
YES
NO
PROMPT USER FOR DECISION AND REVIEW?
30
THIS IS ANOTHER CONTACT WITH SAME NAME
THE CONTACT HAS MOVED, THIS IS THE NEW ADDRESS
REPLACE (ONE OF THE) OLD ADDRESS(ES) FOR THE CONTACT WITH THE NEW ONE
34
THIS IS A ONE-TIME OCCURRENCE: NO ACTION
THIS IS ADDITIONAL ADDRESS FOR THIS CONTACT
INSERT ADDRESS IN DATABASE FOR CONTACT
36
PROMPT USER FOR DECISION AND REVIEW. ADD ADDRESS?
33
YES
NO
FOUND NAME AND ADDRESS
NO ACTION, OR DISPLAY DATA FOR USER EDIT
32

FIG. 2



FIG. 3

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 7



FIG. 4

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 8



FIG. 5

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 9



FIG. 6

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 10

FIG. 7

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 11



| Address is missing | ☒ |

⚠ The contact you entered does not exist. Please specify an address.

68

| OK |

56

**FIG. 8**

| 🗎 Modify Contact's Address | ▬ □ ☒ |

70 — The contact: Hedloy, Alte
already exists in the contact register with the following address:

72 — Home address:
222 222 5ᵗʰ Ave.
New York, NY 10028

This is another contact, I will:
74 —○ Add a new contact with the same name

This is the same contact. I will:
76 —⊙ Change the current address in the contact register
78 —○ Use the above address in my Word document
80 —○ Add a new address to the contact

Use address type:  | Business ▼ |—54

| OK |  | Details... |  | Cancel |
56       58                      60

**FIG. 9**

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 12



Arendi OneButton Contact Register
Existing addresses with the same name
Name
Address type
Address
Zip
City
Country
[1]Hedløy Atle
Business
113 Terrasse street
12191-4292
New York
United State of...
Home
113 113 Jacob Aall street
12191-4292
New York
Name
Atle Hedløy
Address
113 Terrasse street
New York, NY 12191-4292
United States of America
Choose
Full details...
More >>>
Options...
Cancel
Dette er en test
82
84
86
88
90
60
66

FIG. 10



Arendi OneButton Contact Register
Existing addresses with the same name
Name
Address type
Address
Zip
City
Country
[1]Hedløy Atle
Business
113 Terrasse street
12191-4292
New York
United State of...
Home
113 113 Jacob Aall street
12191-4292
New York
Name
Atle Hedløy
Address
113 Terrasse street
New York, NY 12191-4292
United States of America
86
Choose
88
Full details...
90
More >>>
Name
Title:
First:
Atle
Middle:
Last:
Hedløy
Suffix:
Company:
Address type:
Home
54
Street:
151 University Ave.
City:
Palo Alto
State/Province:
CA
ZIP/Postal:
94301-1632
Country:
USA
64
Add and Choose
Add this address to the selected options above
92
66
Options...
Cancel
60
Dette er en test
82
84
62

FIG. 11



Atle Hedløy - Contact
File Edit View Insert Format Tools Contact Help
Save and Close
General
Details
Journal
All Fields
Full Name...
Atle Hedløy
Job title:
Company:
File as:
Hedløy, Atle
Address...
113 Terrasse street
New York, NY 12191-4292
United States of America
Business
This is the mailing address
Phone:
Business
Home
Business Fax
Mobile
E-mail
Web page:
Categories...
Private
94
96
98
100
102
104

FIG. 12



```
┌─────────────────────────────────────────────────────┐
│ Address type already in use                      [X] │
│                                                       │
│    (?)   Do you wish to overwrite this address with   │
│          the one you have specified                   │
│        106                                            │
│              ┌───────┐      ┌───────┐                 │
│              │  Yes  │      │  No   │                 │
│              └───────┘      └───────┘                 │
│                 108            110                     │
└─────────────────────────────────────────────────────┘
```

FIG. 13

42 —

Microsoft Exel - Bok1

Fil  Rediger  Vis  Sett inn  Format  Verktøy  Data  Vindu  Hielp

OneButton

Arial    10    B  I  U

A1    ⌧  ✓  =    Atle Hedløy

| | A | B | C | D | E | F | |
|---|---|---|---|---|---|---|---|
| 1 | Atle Hedløy | | | | | | |
| 2 | | 112 | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | | | | | | | |
| 15 | | | | | | | |

Ark1  Ark2  Ark3

Sett inn                NUM

FIG. 14

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 16

FIG. 15

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 17



FIG. 16

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 18

US 7,496,854 B2

**1**

## METHOD, SYSTEM AND COMPUTER READABLE MEDIUM FOR ADDRESSING HANDLING FROM A COMPUTER PROGRAM

### CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of commonly assigned copending U.S. patent application Ser. No. 09/189, 626, which was filed on Nov. 10, 1998 now U.S. Pat. No. 6,323,853, by Hedloy for a METHOD, SYSTEM and COMPUTER READABLE MEDIUM FOR ADDRESSING HANDLING FROM A COMPUTER PROGRAM and is hereby incorporated by reference.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to a method, system and computer readable medium for name and address handling (hereinafter called "address handling"), and more particularly to a touch screen, keyboard button, icon, menu, voice command device, etc. (hereinafter called "button") provided in a computer program, such as word processing program, spreadsheet program, etc., and coupled to an information management source for providing address handling within a document created by the computer program.

2. Background Information

In recent years, with the advent of programs, such as word processors, spreadsheets, etc. (hereinafter called "word processors") users may require retrieval of information, such as name and address information, etc., for insertion into a document, such a letter, fax, etc., created with the word processor. Typically, the information is retrieved by the user from an information management source external to the word processor, such as a database program, contact management program, etc., or from the word processor itself, for insertion into the document. Examples of such word processors are WORD™, NOTEPAD™, EXCEL™, WORDPAD™, WORDPERFECT™, QUATROPRO™, AMIPRO™, etc., and examples of such information management sources are ACCESS™, OUTLOOK™, ORACLE™, DBASE™, RBASE™, CARDFILE™, etc.

However, the information in the database must constantly be updated by the user. This requires the user to learn how to use and have access to the database. In this case, a change in the information, such as change in address or a name, etc., requires the user of the word processor to implement this change in the database, or alternatively, the change is made to the database centrally by a database administrator.

### SUMMARY OF THE INVENTION

Accordingly, an object of the present invention is to provide a method, system and computer readable medium for address handling within a computer program.

Another object of the present invention is to provide a method, system and computer readable medium for address handling within a computer program, such as a word processing program, spreadsheet program, etc.

Another object of the present invention is to provide a method, system and computer readable medium for address handling within a computer program, such as a word processing program, spreadsheet program, etc., using an input device provided in the computer program.

Another object of the present invention is to provide a method, system and computer readable medium for address

**2**

handling within a computer program, such as a word processing program, spreadsheet program, etc., using an input device, such as a touch screen, keyboard button, icon, menu, voice command device, etc., provided in the computer program and coupled to an information management source.

Another object of the present invention is to provide a method, system and computer readable medium for address handling within a computer program, such as a word processing program, spreadsheet program, etc., using an input device such as a touch screen, keyboard button, icon, menu, voice command device, etc., provided in the computer program and coupled to an information management source, such as a database program, contact management program, etc.

The above and other objects are achieved according to the present invention by providing a novel method, system and computer readable medium for providing a function item, such as a key, button, icon, or menu, tied to a user operation in a computer, whereby a single click on the function item in a window or program on a computer screen, or one single selection in a menu in a program, initiates retrieval of name and addresses and/or other person or company related information, while the user works simultaneously in another program, e.g., a word processor. The click on the function item initiates a program connected to the button to search a database or file available on or through the computer, containing the person, company or address related data, in order to look up data corresponding to what the user types, or partly typed, e.g., name and/or address in the word processor, the correct data from the database, data related to the typed data, e.g., the name of the person, company, or the traditional or electronic address, or other person, or company, or address related data, and alternatively the persons, companies, or addresses, are displayed and possibly entered into the word processor, if such related data exists.

The present invention also includes a computer readable medium storing program instructions by which the method of the invention can be performed when the stored program instructions are appropriately loaded into a computer, and a system for implementing the method of the invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

The invention description below refers to the accompanying drawings, of which:

FIG. **1** is a flow chart illustrating a method for address handling within a computer program, according to an exemplary embodiment of the present invention;

FIG. **2** is a flow chart illustrating a method for address handling within a computer program, according to another exemplary embodiment of the present invention;

FIG. **3** is a screen shot illustrating the inputting of a name to be searched and an address handling button within a word processor, according to an exemplary embodiment of the present invention;

FIG. **4** is a screen shot illustrating a retrieved address in a word processor, according to an exemplary embodiment of the present invention;

FIG. **5** is a screen shot illustrating the inputting of a name and address to be searched and an address handling button within a word processor, according to an exemplary embodiment of the present invention;

FIG. **6** is a screen shot illustrating an add new contact message window, according to an exemplary embodiment of the present invention;

FIG. **7** is a screen shot illustrating a contact register message window, according to an exemplary embodiment of the present invention;

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 19

US 7,496,854 B2

3

FIG. **8** is a screen shot illustrating an address missing message window, according to an exemplary embodiment of the present invention;

FIG. **9** is a screen shot illustrating a modify contact's address message window, according to an exemplary embodiment of the present invention;

FIG. **10** is a screen shot illustrating a select a contact address register message window, according to an exemplary embodiment of the present invention;

FIG. **11** is a screen shot illustrating a more detailed mode of registering an additional address for the contact register of FIG. **9**, according to an exemplary embodiment of the present invention;

FIG. **12** is a screen shot illustrating a contact management program window in a full detailed mode, according to an exemplary embodiment of the present invention;

FIG. **13** is a screen shot illustrating an address already in use message window, according to an exemplary embodiment of the present invention;

FIG. **14** is a screen shot illustrating the inputting of a name to be searched and an address handling button within a spreadsheet, according to an exemplary embodiment of the present invention;

FIG. **15** is a screen shot illustrating a retrieved address in a spreadsheet, according to an exemplary embodiment of the present invention; and

FIG. **16** is a schematic illustration of a general purpose computer for performing the processes of the present invention, according to an exemplary embodiment of the preis sent invention.

DETAILED DESCRIPTION OF AN
ILLUSTRATIVE EMBODIMENT

In an embodiment of the present invention, single button addressing is a achieved by providing an input device, such as a touch screen, keyboard, icon, menu, voice command device, etc. (hereinafter called "button"), in a computer program, such as a word processing program, spreadsheet program, etc. (hereinafter called "word processor"), for executing address handling therein.

Accordingly, in a word processor, the button is added and a user types information, such as an addressee's name, or a part of the name, etc. in a document created with the word processor, such as a letter, fax, etc., and then clicks, selects, commands, etc. the button via the appropriate input device, such as a touch screen button, keyboard button, icon, menu choice, voice command device, etc. A program then executes and retrieves the typed information from the document, and searches an information management source, such as a database, file, database program, contact management program, etc. (hereinafter called "database") to determine if the information, such as the name or part of the name typed and searched by the program exists in the database. If the program does not find stored information, such as a name, corresponding to the name or part of the name typed, the user is asked by the program whether the information, such as the name that was not found, should be added to the database. In addition, the user may enter any other information besides the name, such as addresses, businesses, telephone numbers, fax numbers, e-mail address, etc., so that this other information can be stored in the database for later use.

If the program finds name(s) and address(es) corresponding to the part of the addressee's name typed, this additional information is automatically entered into the user's word processor, optionally with a confirmation from the user that this is the correct data. If the typed address information does

4

not correspond to data already stored in the database, after clicking on the button, the program, for example, lets the user decide: (1) if this is new data (e.g., a new address) for an existing contact; (2) if the stored data should be changed to what the user just typed; (3) if this is a new contact with the same name as the one already entered into the database; or (4) if the typed address is only to be used once, and therefore not to be stored in the database at all. If, later, for example, a name with several address stored in the database is recalled, all addresses for this contact will be displayed, so that the correct address can be selected by the user.

The program may be extended to also store and retrieve other information, such as telephone numbers, fax numbers, e-mail addresses, etc. Once the program recalls the telephone numbers, fax numbers, email addresses, etc., the user can command the program to send e-mails, faxes, etc. Similarly, if the user types in the name of a mailing list, the program create merge letters, group emails, etc.

Referring now to the drawings, wherein like reference numerals designate identical or corresponding parts throughout the several views, and more particularly to FIGS. **1** and **2** thereof, there is illustrated flow charts of single button addressing, according to exemplary embodiments of the present invention.

In FIG. **1**, after the user has inserted the address in the word processor, the user commands the button at step **2** and the program analyzes what the user has typed in the document at step **4**. AT step **6**, the program decides what was found in the document and if the program found nothing in the document or what it found was un-interpretable the program goes to step **8** and outputs an appropriate message to the user and then quits at step **16**. The program analyzes what the user has typed in the document at step **4**, for example, by analyzing (i) paragraph/line separations/formatting, etc.; (ii) street, avenue, is drive, lane, boulevard, city, state, zip code, country designators and abbreviations, etc.; (iii) Mr., Mrs., Sir, Madam, Jr., Sr. designators and abbreviations, etc.; (iv) Inc., Ltd., P.C., L.L.C, designators and abbreviations, etc.; and (v) a database of common male/female names, etc.

If the program find an e-mail address mailing list/category name telephone number or other information, at step **10** an appropriate action is performed by the program and then the program execution quits at step **16**. If the program only finds a name or initials, or the like, the program looks up the name in the database at step **12** and at step **18** the program determines what was found. If the program finds more than one possible contact/address match, at step **20** the program displays menu choices to the user to let him choose an appropriate answer. Then at step **22** the program inserts a correct address and name in the document and then at step **16** the program quits execution. If the program finds one match exactly, i.e., one contact with one address, the program inserts the correct address and name in the document at step **22** then quits and then quits execution at step **16**. If the program does not find a name in the database, at step **24** the program prompts the user to specify an address and then quits execution at step **16**. If the program at step **6** finds a name and an address, at step **14** the name is looked up in the database. Then, at step **26**, if no match is found, at step **28** the program inserts an address and a name which are possibly corrected by the user into the database and then quits execution at step **16**. If at step **26**, the name and address is found, at step **32** the program either takes no action or displays the data for the user to edit. If at step **26**, the name is found but not the address, the program prompts the user for a decision at step **30**. If the user decides that this is another contact with a same name, the program goes to step **28**. If the is user decides that this is a one

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 20

US 7,496,854 B2

**5**

time occurrence, no action is taken and the program quits at step **16**. If the user decides that the contact has, for example, moved and that this is a new address, at step **34** one of the old addresses for the contact is replaced with the new one and the program with the new one and the program quits at step **16**. If the user decides that this is an additional address for the contact, at step **36** the additional address is inserted into the database for that contact and execution quits at step **16**.

The flowchart shown in FIG. **2** is similar to the flowchart in FIG. **1**, except for some additional steps which will now be discussed. At step **6**, if the program only finds a name or a similar name then the name is looked up in the database at step **12**, then at step **18** if the program found more than one possible contact/address match, the program displays choices to the user to let him choose an address at step **20**. Then at step **21** the user decides whether to insert the selected address into the document. If the user does not decide to select the address into the document the program quits execution at step **16**. If the user decides to insert the selected address into the document the program inserts the address and name into the document at step **22** and then quits at step **16**.

If the program finds a name and address in the database at step **6**, then at step **14** the program looks up the name in the database and at step **26** the program determines what it has found. If the program does not find the name at step **26**, at step **27** the program prompts the user for a decision and review and whether to insert the contact address. If the user does not decide to insert the contact address, the program quits at step **16**. If the user decides to insert the contact address, at step **28** the program inserts the address and name which may be possibly corrected by the user for program in the database then execution quits at step **16**.

If at step **26** the program finds a name and not an address, then at step **29** the name is looked up in the database. Then at step **31** the program decides whether this contact has another address. If the contact does not have another address, at step **33** the program prompts the user for a decision and review and whether to add the address. If the user does not want to add the address at step **33**, the program quits at step **16**. If the user wants to add the address at step **33** because this is an additional address for the contact, at step **36** the address is inserted in the database for the contact and execution quits at step **16**.

At step **30**, if the user decides that this is another contact with the same name, then the program goes to step **28**. If at step **30** the user decides that this is a one time occurrence, then the program quits at step **16**. If at step **30**, the user decides that the contact has, for example, moved, the program goes to step **34**. If at step **30**, the user decides that this is an additional address for the contact, at step **36** the program inserts the address in the database for the contact and then quits at step **16**.

Various exemplary screen shots which are generated during execution of the program, according to the present invention, will now be described with reference to FIGS. **3**-**15** and examples 1-7 as follows.

Example 1

Retrieving an Existing Address from the Database

FIG. **3** illustrates a starting point in word processor document such as WORD document, wherein the user has typed a name **40**. The user hits the button **42**, for example, marked "OneButton" and the program according to the present invention retrieves the name **40** from the document, searches a

**6**

database for the name **40**, and inserts the retrieved address **44** associated with the name **40** into the document as shown in, for example, FIG. **4**.

The above example corresponds to steps **2**, **4**, **6**, **12**, **18**, **22** and **16** in the flow charts of FIGS. **1** and **2**.

Example 2

Adding a New Contact to the Database

FIG. **5** illustrates a starting point in word processor document such as WORD document, wherein the user has typed a name and address of a new contact **46**. The user commands the button **42**, for example, marked "OneButton," and the program according to the invention retrieves the new contact **46** from the document, searches a database for the name of the new contact **46** and generates a screen as shown in, for example, FIG. **6**. This screen includes a message **50** informing the user that the new contact does not exist in the database, a message **52** including the address retrieved from the document, an address type selection **54**, such as home, business, etc., and "OK," "Details," and "Cancel" buttons **56**, **58**, and **60**, respectively.

At this point, the user can cancel the operation by commanding the Cancel button **60**, ask the program to store data in the database and return the document by commanding the OK button **56**, or check details before storing data into the database by commanding the Details button **58**. If the user commands the Details button **58**, as shown in, for example, FIG. **7**, a message screen is provided so that the user can review and edit data **62** and the selection **54**, store the data **62** and **54** in the database by commanding a "Add and Choose" button **64**, see more options by commanding an "Options" button **66**, or cancel the operation by commanding the Cancel button **60**.

The above example corresponds to steps **2**, **4**, **6**, **14**, **26**, **28** and **16** in the flow chart of FIG. **1** and steps **2**, **4**, **6**, **14**, **26**, **27**, **28** and **16** in the flow chart of FIG. **1** and steps **2**, **4**, **6**, **26**, **27**, **28** and **16** in the flow chart of FIG. **2**.

Example 3

Try to Retrieve Existing Address, But Contact is not in Database

FIG. **3** illustrates a starting point in word processor document, such as WORD document, wherein the user has typed a name of a contact **40**. The user commands the button **42**, for example, marked "OneButton," and the program according to the present invention retrieves the name **40** from the document, searches a database for the name of the contact **40** and generates a screen as shown in, for example, FIG. **8**. This screen includes a message **68** informing the user that the contact does not exist in the database and to specify an address, and "OK" buttons **56**. At this point when the user commands the OK button **56**, the user returns to the document so that he contact's address can be included as in Example 2 above.

The above example corresponds to steps **2**, **4**, **6**, **12**, **18**, **24**, and **16** in the flow of charts of FIGS. **1** and **2**.

Example 4

Adding a New Address for an Existing Contact
(Short Version)

FIG. **4** illustrates a starting point in word processor document, such as WORD document, wherein the user has typed

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 21

US 7,496,854 B2

**7**

a name and new address of an existing contact **44**. The user commands the button **42**, for example, marked "OneButton," and the program according to the present invention retrieves the existing contact **44** from the document, searches a database for the same name of the existing contact **44** and generates a screen as shown in, for example, FIG. **9**. This screen includes a message **70** informing the user that the contact already exists in the database with an existing address, a message **72** including the existing address, add new contact with same name selection **74**, change existing address selection **76**, use existing address in document selection **78**, add the new address contact selection **80**, the address type selection **54**, such as home, business, etc., and the "OK," "Details," and "Cancel" buttons **56**, **58** and **60** respectively. AT this point, the user may select one of the four options **74**-**80**, and command the OK button **56** to execute the selected options. The user can also cancel the operation by commanding the Cancel button **60**, or check details before storing data into the database by commanding the Details button **58**.

The above example corresponds to steps **2**, **4**, **6**, **14**, **26**, **28**, **30**, **34**, **36**, and **16** in the flow chart of FIG. **1** and steps **2**, **4**, **6**, **14**, **26**, **29**, **31**, **30**, **28**, **34**, **36**, and **16** in the flow chart of FIG. **2**.

### Example 5

### Selecting Between Several Possible Matching Addresses

FIG. **3** illustrates a starting point in word processor document, such as WORD document, wherein the user has typed a name and possibly address of at least one existing contact **40**. The user commands the button **42**, for example, marked "OneButton," and the program according to the present invention retrieves the existing contact **40** from the document, searches a database for the name of the existing contact **40** and generates a screen as shown in, for example, FIG. **10**. This screen includes a message informing the user the name corresponds to several addresses and possible contacts which already exist in the database, with existing contacts and addresses for selection **82**, a message **84** including the full name and address for the contact that the user selects in **82**, the Options button **66**, a "Choose" button **86**, a "Full details" button **88**, a "More>>>" button **90**, and the Cancel button **60**. The above screen indicates to the user that at least one contact with the same name exists, and that there are more than one addresses and/or contacts that match.

At this point, the user may command the Choose button **86** to use the selected address and return to the document, or the user may command the More>>> button **90** to view how the program interpreted what he user typed in the word processor, and possibly change this data, wherein the program generates an updated screen as shown in, for example, FIG. **11**. The updated screen includes the data **62** which displays the name typed for example, FIG. **11**. The updated screen includes the data **62** which displays the name typed in the word processor as interpreted by the program, address fields, and the fields for the address type selection **54**, such as home, business, etc., which may be changed by the user before the program stores it in the database, the Add and Choose button **64**, a "<<<Less" button **90** corresponding to the More>>> button **90** for returning to the screen of FIG. **10**, and an "Add this address to the selected contact above" button **92**. The user might then command the Add this address to the selected contact above button **92** and the result in the word processor is illustrated in FIG. **4**. The user can also cancel the operations by commanding the Cancel button **60**, or command the add choose button

**8**

**64** to add this name and address as a new contact and address, or open the database before storing data into the database by commanding a "Full details" button **88** as will be later described.

The above example corresponds to steps **2**, **4**, **6**, **12**, **18**, **20**, **22**, and **16** in the flow chart of FIG. **1** and steps **2**, **4**, **6**, **12**, **18**, **20**, **21**, **22**, and **16** in the flow chart of FIG. **2**.

### Example 6

### Adding a New Address for an Existing Contact (Long Version)

FIG. **4** illustrates a starting point in word processor document, such as WORD document, wherein the user has typed a name and new address of an existing contact **44**. The user commands the button **42**, for example, marked "OneButton," and the program according to the present invention retrieves the existing contact **44** from the document, searches a database for the name of the existing contact **44** and generates a screen as shown in, for example, FIG. **9**. As previously described the screen includes a message **70** informing the user that the contact already exists in the database with an existing address, and the user may command the Details button **58** to see the details of the new address for potentially modify the details before they are stored in the database and the program generates a screen as shown in, for example, FIG. **10**. From this screen, the user may choose to use another address than the one he typed, and return to the document, or the user may command the "Full details" button **88** to enter a database program, such as OUTLOOK™, directly as shown in, for example, FIG. **12**. In FIG. **12**, the database program, such as OUTLOOK™, may include portions **94**-**104** for allowing the user to modify various pieces of data before they are stored in the database.

Alternatively, in the screen shown in FIG. **10**, the user may command the More>>> button **90** at which time the program generates the screen as shown in, for example, FIG. **11** and as previously described. In this screen, the user might then command the Add this address to the selected contact above button **92**. If the address typed is already in use, the program generates a screen including a message **106**, and "Yes" and "No" buttons, **108** and **110**, respectively, as shown in, for example, FIG. **13**. If the user hits the Yes button **108** the program overwrites the contact address with the address specified by the user (e.g., if the contact has moved) and the result in the word processor is shown in, for example FIG. **4**.

The above example corresponds to steps **2**, **4**, **6**, **12**, **14**, **26**, **28**, **30**, **34**, **36**, and **16** in the flow chart of FIG. **1** and steps **2**, **4**, **6**, **12**, **14**, **26**, **29**, **31**, **30**, **28**, **34**, **36**, and **16** in the flow chart of FIG. **2**.

### Example 7

### Spreadsheet Application

FIG. **14** illustrates a starting point in word processor document, such as an EXCEL spreadsheet, wherein the user has typed a name **112**. The user hits the button **42**, for example, marked "OneButton," and the program according to the present invention retrieves the name **112** from the spreadsheet, searches a database for the name **112**, and inserts the retrieved address **114** into the spreadsheet as shown in, for example, FIG. **15**. Accordingly, the examples 1-6 apply not only to word processor documents, such as WORD™ documents, etc., but to other word processor documents, and spreadsheets, such as EXCEL™ spreadsheets, etc.

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 22

US 7,496,854 B2

**9**

The above example corresponds to steps **2**, **4**, **12**, **18**, **22**, and **16** in the flow of charts FIGS. **1** and **2**.

FIG. **16** is a schematic illustration of a computer system for implementing the single button addressing according to the present invention. A computer **200** implements the method of the present invention, wherein the computer includes, for example, a display device **202**, such as a conventional display device or a touch screen monitor with a touch screen interface, etc., a keyboard **204**, a pointing device **206**, a mouse pad or digitizing pad **208**, a hard disk **210**, or other fixed, high density media drives, connected using an appropriate device bus (e.g., a SCSI bus, an Ultra DMA bus, a PCI bus, etc.), a floppy drive **212**, a tape or CD ROM drive **214** with tape or CD media **216**, or other removable media devices, such as magneto-optical media, etc., and a mother board **218**. The mother board **218** includes, for example, a processor **220**, a RAM **222**, and ROM **224** (e.g., DRAM, ROM, EPROM, EEPROM, SRAM, SDRAM, and Flash RAM, etc.), I/O ports **226** which may be used to couple to external devices, networks, etc., (not shown), and optional special purpose logic devices (e.g., ASICs) or configurable logic devices (e.g., GAL and re-programmable FPGA) **228** for performing specialized hardware/software functions, such as sound processing, image processing, signal processing, neural network processing, object character recognition (OCR) processing, etc., a microphone **230**, and a speaker or speakers **232**.

As stated above, the system includes at least one computer readable medium or alternatively, the computer readable medium may be accessed through various paths, such as networks, internet, drives, etc. Examples of computer readable media are compact discs, hard disks, floppy disks, tape, magneto-optical disks, PROMs (EPROM, EEPROM, Flash, EPROM), DRAM, SRAM, SDRAM, etc. Stored on any one or on a combination of computer readable media, the present invention includes software for controlling both the hardware of the computer **200** and for enabling the computer **200** to interact with a human user. Such software may include, but is not limited to, device drivers, operating systems and user applications, such as development tools. Such computer readable media further includes the computer program product of the present invention for performing any of the processes according to the present invention, described above (see, e.g., FIGS. **1**-**15**). The computer code devices of the present invention can be any interpreted or executable code mechanism, including but not limited to scripts, interpreters, dynamic link libraries, Java classes, and complete executable programs, etc.

The invention may also be implemented by the preparation of application specific integrated circuits or by interconnecting an appropriate network of conventional component circuits, as will be readily apparent to those skilled in the art.

Address handling, according to this invention, is a significant simplification relative to existing methods, and requires little or no training on the part of a user, as correct addresses are retrieved with a minimal number of user commands, "clicks," keystrokes, etc. In addition, a program according to the present invention, can be programmed and created in most existing programming languages and be connected to most modern word processors. Therefore, according to the present invention, the process of creating and updating records in an address database is significantly simplified, since this may now be performed directly from the word processor.

Although the present invention is defined in terms of word processing documents, such as WORD™ documents and EXCEL™ spreadsheets, the present invention is applicable to all types of word processing documents such as NOTE-

**10**

PAD™, WORDPAD™, WORDPERFECT™, QUATRO-PRO™, AMIPRO™, etc., as will be readily apparent to those skilled in the art.

Although the present invention is defined in terms of information management or is database programs, such as OUT-LOOK™, etc., the present invention is applicable to all types of information management or database programs such as ACCESS™, ORACLE™, DBASE™, RBASE™, CARD-FILE™, including "flat files," etc., as will be readily apparent to those skilled in the art.

Although the present invention is defined in terms of providing an input device, such as a button **42** in a word processor for address handling therein, the present invention may be practiced with all types of input devices, such as touch screen, keyboard button, icon, menu, voice command device, etc., as will be readily apparent to those skilled in the art.

Although the present invention is defined in terms of a program retrieving information from a document before searching a database, the user may select the information in the document to be searched by the program in the database (e.g., by highlighting, selecting, italicizing, underlining, etc.), as will be readily apparent to those skilled in the art.

Although the present invention is defined in terms of a program retrieving a name or portion thereof from a document before searching a database the program may retrieve an address or portion thereof from the document before searching the database and insert, correct, complete, etc., the retrieved address based on the information found in the database corresponding to the retrieved address or portion thereof, as will be readily apparent to those skilled in the art.

Obviously, numerous modifications and variations of the present invention are possible in light of the above teachings. It is therefore to be understood that within the scope of appended claims, the invention may be practiced otherwise than as specifically described herein.

This application claims priority and contains subject matter related to Norwegian patent application No. 984066 filed on Sep. 3, 1998, the entire contents of which are hereby incorporated by reference.

What is claimed is:

**1**. A method for information handling within a document created using a first application program comprising the steps of:

entering a first information in the first application program;

marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

**2**. The method of claim **1** wherein the user selection further comprises an activation of a device selected from a group consisting of a touch screen, a keyboard button, a screen button, an icon, a menu, and a voice command device.

**3**. The method of claim **1**, wherein the step of inserting the second information into the document further comprises the steps of:

initializing the second application program;

searching, using the second application program, for the second information associated with the first information; and

retrieving the second information.

**4**. The method of claim **3**, wherein when the second application program includes second information associated with the first information, performing the further step of displaying the second information.

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 23

US 7,496,854 B2

**11**

**5**. The method of claim **4**, further comprising the step of completing at least one of the first and second information in the document.

**6**. The method of claim **1**, wherein the first information comprises a name.

**7**. A computer readable medium, including program instructions related to information handling within a document created using a first application program and for performing the steps of:

entering a first information in the first application program;

marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

**8**. The computer readable medium of claim **7**, wherein the user selection further comprises an activation of a device selected from a group consisting of a touch screen, a keyboard button, a screen button, an icon, a menu, and a voice command device.

**9**. The computer readable medium of claim **7**, wherein the step of inserting the second information into the document further comprises the steps of:

initializing the second application program;

searching, using the second application program, for the second information associated with the first information; and

retrieving the second information.

**10**. The computer readable medium of claim **9**, wherein when the second application program includes second information associated with the first information, performing the further step of displaying the second information.

**11**. The computer readable medium of claim **10**, further comprising the step of completing at least one of the first and second information in the document.

**12**. The computer readable medium of claim **7**, wherein the first information comprises a name.

**13**. A computer system related to information handling within a document created using a first application program, comprising:

means for entering a first information in the first application program;

means for marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

means for responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

**14**. The computer system of claim **13**, wherein the means for the user selection further comprises:

means for an activation of a device selected from a group consisting of a touch screen, a keyboard button, a screen button, an icon, a menu, and a voice command device.

**15**. The computer system of claim **13**, wherein the means for inserting the second information into the document further comprises:

means for initializing the second application program;

means for searching, using the second application program, for the second information associated with the first information; and

means for retrieving the second information.

**16**. The computer system of claim **15**, wherein when the second application program includes second information

**12**

associated with the first information, and comprising means for performing the further step of displaying the second information.

**17**. The computer system of claim **16**, further comprising means for completing at least one of the first and second information in the document.

**18**. The computer system of claim **13**, wherein the first information comprises a name.

**19**. A method for information handling within a document created by a first application program comprising the steps of:

entering a first information in the first application program;

marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

responding to a user selection by performing an operation related to a second information, the second information associated with the first information from the second application program.

**20**. The method of claim **19** wherein the operation comprises displaying the second information.

**21**. The method of claim **19**, wherein the first information is a name, and the operation performed is selected from a group consisting of an electronic mail, a telex, a facsimile or a letter addressed to the name indicated by the first information.

**22**. The method of claim **19**, wherein the operation performed is entering additional data into a database.

**23**. The method of claim **22**, wherein the additional data is entered by a user.

**24**. The method of claim **22**, wherein the additional data is located within the document.

**25**. A computer readable medium, including program instructions related to information handling within a document created by a first application program and for performing the steps of:

entering a first information in the first application program;

marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

responding to a user selection by performing an operation related to a second information, the second information associated with the first information from the second application program.

**26**. The computer readable medium of claim **25** wherein the operation comprises displaying the second information.

**27**. The computer readable medium of claim **25**, wherein the first information is a name, and the operation performed is selected from a group consisting of an electronic mail, a telex, a facsimile or a letter addressed to the name indicated by the first information.

**28**. The computer readable medium of claim **25**, wherein the operation performed is entering additional data into a database.

**29**. The computer readable medium of claim **28**, wherein the additional data is entered by a user.

**30**. The computer readable medium of claim **28**, wherein the additional data is located within the document.

**31**. A computer system related to information handling within a document created by a first application program, comprising:

means for entering a first information in the first application program;

means for marking without user intervention the first information to alert the user that the first information can be utilized in a second application program; and

means for responding to a user selection by performing an operation related to a second information, the second

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 24

US 7,496,854 B2

| 13 | 14 |

information associated with the first information from the second application program.

**32**. The computer system of claim **31** wherein the operation comprises displaying the second information.

**33**. The computer system of claim **31**, wherein the first information is a name, and the operation performed is selected from a group consisting of an electronic mail, a telex, a facsimile or a letter addressed to the name indicated by the first information.

**34**. The computer system of claim **31**, wherein the operation performed is entering additional data into a database.

**35**. The computer system of claim **34**, wherein the additional data is entered by a user.

**36**. A method for information handling within a document operated on by a first application program, the document containing first information that can be utilized in a second application program, the method comprising the steps of:

identifying without user intervention or designation the first information; and

responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

**37**. The method of claim **36**, wherein the user selection further comprises an activation of a device selected from a group consisting of a touch screen, a keyboard button, a screen button, an icon, a menu, and a voice command device.

**38**. The method of claim **36**, wherein the step of inserting the second information into the document further comprises the steps of:

initializing the second application program;

searching, using the second application program, for the second information associated with the first information; and

retrieving the second information.

**39**. The method of claim **38** wherein the step of inserting the second information into the document further comprises adding the second information to the first information in the document.

**40**. The method of claim **38**, wherein when the second application program includes second information associated with the first information, performing the further step of displaying the second information.

**41**. The method of claim **38**, further comprising the step of completing at least one of the first and second information in the document.

**42**. The method of claim **36**, wherein the first information comprises a name.

**43**. A computer readable medium, including program instructions related to information handling within a document operated on by a first application program, the document containing first information that can be utilized in a second application program, and for performing the steps of:

identifying without user intervention or designation the first information; and

responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

**44**. The computer readable medium of claim **43**, wherein the user selection further comprises an activation of a device selected from a group consisting of a touch screen, a keyboard button, a screen button, an icon, a menu, and a voice command device.

**45**. The computer readable medium of claim **43**, wherein the step of inserting the second information into the document further comprises the steps of:

initializing the second application program;

searching, using the second application program, for the second information associated with the first information; and

retrieving the second information.

**46**. The method of claim **45** wherein the step of inserting the second information into the document further comprises adding the second information to the first information in the document.

**47**. The computer readable medium of claim **46**, wherein when the second application program includes second information associated with the first information, performing the further step of displaying the second information.

**48**. The computer readable medium of claim **46**, further comprising the step of completing at least one of the first and second information in the document.

**49**. The computer readable medium of claim **43**, wherein the first information comprises a name.

**50**. A computer system related to information handling within a document operated on by a first application program, the document containing first information that can be utilized in a second application program, comprising:

means for identifying without user intervention or designation the first information; and

means for responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program.

**51**. The computer system of claim **50**, wherein the means for user selection further comprises means for an activation of a device selected from a group consisting of a touch screen, a keyboard button, a screen button, an icon, a menu, and a voice command device.

**52**. The computer system of claim **50**, wherein the means for inserting the second information into the document further comprises:

means for initializing the second application program;

means for searching, using the second application program, for the second information associated with the first information; and

means for retrieving the second information.

**53**. The computer system of claim **50** wherein the means for inserting the second information into the document further comprises means for adding the second information to the first information in the document.

**54**. The computer system of claim **50**, wherein when the second application program includes second information associated with the first information, and comprising means for performing the further step of displaying the second information.

**55**. The computer system of claim **54**, further comprising means for completing at least one of the first and second information in the document.

**56**. The computer system of claim **50**, wherein the first information comprises a name.

**57**. A method for information handling within a document operated on by a first application program, the document containing first information that can be utilized in a second application program the method comprising the steps of:

identifying without user intervention or designation the first information; and

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 25

US 7,496,854 B2

15

responding to a user selection by performing an operation related to a second information, the second information associated with the first information from the second application program.

**58**. The method of claim **57** wherein the operation comprises displaying the second information.

**59**. The method of claim **57**, wherein the first information is a name, and the operation performed is selected from a group consisting of generating an electronic mail, a telex, a facsimile or a letter addressed to the name indicated by the first information.

**60**. The method of claim **57**, wherein the operation performed is entering additional data into a database.

**61**. The method of claim **60**, wherein the additional data is entered by a user.

**62**. The method of claim **60**, wherein the additional data is located within the document.

**63**. The method of claim **57** wherein the user selection comprises an activation of a menu.

**64**. The method of claim **63**, wherein the step of performing the operation further comprises the steps of:

initializing the second application program;

searching, using the second application program, for the second information associated with the first information; and

retrieving the second information.

**65**. The method of claim **64**, wherein when the second information associated with first information exists, performing the further step of displaying the second information.

**66**. The method of claim **65**, wherein the first information comprises a name.

**67**. The method of claim **66**, wherein the activation of the menu comprises

selecting the menu indicator for the menu

opening the menu

selecting a choice in the menu; and

activating the selected choice in the menu.

**68**. The method of claim **67**, wherein selection of the menu indicator comprises moving a mouse pointer to the menu indicator.

**69**. The method of claim **68**, wherein the opening of a menu comprises clicking on the menu indicator with a mouse button.

**70**. The method of claim **57** wherein at least part of the identifying occurs after the user selection.

**71**. The method of claim **57** wherein the identifying occurs after the user selection.

**72**. The method of claim **57**, wherein the second information is associated with only part of the identified first information.

**73**. A computer readable medium, including program instructions related to information handling within a document operated on by a first application program, the document containing first information that can be utilized in a second application program, and for performing the steps of:

identifying without user intervention or designation the first information; and

responding to a user selection by performing an operation related to a second information, the second information associated with the first information from the second application program.

**74**. The computer readable medium of claim **73** wherein the operation comprises displaying the second information.

**75**. The computer readable media of claim **73**, wherein the first information is a name, and the operation performed is selected from a group consisting of generating an electronic

16

mail, a telex, a facsimile or a letter addressed to the name indicated by the first information.

**76**. The computer readable media of claim **73**, wherein the operation performed is entering additional data into a database.

**77**. The computer readable media of claim **76**, wherein the additional data is entered by a user.

**78**. The computer readable media of claim **76**, wherein the additional data is located within the document.

**79**. A computer system related to information handling within a document operated on by a first application program, the document containing first information that can be utilized in a second application program, comprising:

means for identifying without user intervention or designation the first information; and

means for responding to a user selection by performing an operation related to a second information, the second information associated with the first information from the second application program.

**80**. The computer system of claim **79** wherein the operation comprises displaying the second information.

**81**. The computer system of claim **79**, wherein the first information is a name, and the operation performed is selected from a group consisting of generating an electronic mail, a telex, a facsimile or a letter addressed to the name indicated by the first information.

**82**. The computer system of claim **79**, wherein the operation performed is entering additional data into a database.

**83**. The computer system of claim **82**, wherein the additional data is entered by a user.

**84**. The computer system of claim **82**, wherein the additional data is located within the document.

**85**. A method for information handling within a document operated on by a first application program, the document containing first information entered by a user, the method comprising the steps of:

identifying without user intervention or designation the first information that can be utilized in a second application program, the first information selected from a group consisting of a name and an address; and

responding to a user selection by performing an operation related to a second information, the second information associated with all or part of the first information from the second application program, wherein the step of responding to the user selection further comprises the steps of:

initializing the second application program;

searching, using the second application program, for the second information associated with the first information; and

if said second information exists, retrieving and displaying the second information;

wherein said user selection comprises:

selecting a menu indicator for the menu;

opening the menu;

selecting a choice in the menu; and

activating the selected choice in the menu;

wherein selecting the menu indicator comprises moving the mouse pointer to the menu indicator;

wherein opening the menu comprises clicking on the menu indicator with a mouse button;

wherein the second information is associated with at least part of the identified first information.

**86**. A method for assisting a computer operator to retrieve contact related information from a database when a document includes a name, the method comprising of the steps of:

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 26

US 7,496,854 B2

<table>
<tr><td>17</td><td>18</td></tr>
</table>

(1) using a first computer program to analyze the document, without direction from the operator, to identify the name,

(2) using the identified name and a second computer program to search the database and to locate contact related information associated with the name, and

(3) inserting the contact related information into the document,

wherein steps (1)-(3) require only a single execute command.

**87**. The method of claim **86** wherein the contact related information comprises an address.

**88**. The method of claim **86** wherein the contact related information comprises a telephone number.

**89**. The method of claim **86** wherein the name comprises a business name.

**90**. The method of claim **86** wherein the name comprises a personal name.

**91**. The method according to claim **86** wherein the execute command is a selection from a menu.

**92**. The method according to claim **91** wherein the operator enters the execute command before step (2).

**93**. A method for assisting a computer operator to retrieve information from a database that is related to text in a document, the method comprising the steps of:

(1) using a first computer program to analyze the document, without direction from the operator, to identify text in the document that can be used to search for related information,

(2) using a second computer program and the text identified in step (1) to search the database and to locate related information, and

(3) inserting the information located in step (2) into the document.

**94**. The method according to claim **93** wherein at least steps (2)-(3) take place following entry a single execute command.

**95**. The method according to claim **94** wherein the execute command is a selection from a menu.

**96**. A computer readable medium for information handling within a document operated on by a first application program, the document containing first information entered by a user, the computer readable medium including program instructions for performing the steps of:

identifying without user intervention or designation the first information that can be utilized in a second application program, the first information selected from a group consisting of a name and an address; and

responding to a user selection by performing an operation related to a second information, the second information associated with all or part of the first information from the second application program, wherein the step of responding to the user selection further comprises the steps of:

initializing the second application program;

searching, using the second application program, for the second information associated with the first information; and

if said second information exists, retrieving and displaying the second information;

wherein said user selection comprises:

selecting a menu indicator for the menu;

opening the menu;

selecting a choice in the menu; and

activating the selected choice in the menu;

wherein selection the menu indicator comprises moving the mouse pointer to the menu indicator;

wherein the opening of a menu comprises clicking on the menu indicator with a mouse button; and

wherein the second information is associated with at least part of the identified first information.

**97**. A computer readable medium for assisting a computer operator to retrieve contact related information from a database when a document includes a name, the computer readable medium including program instructions for performing the steps of:

(1) using a first computer program to analyze the document, without direction from the operator, to identify the name,

(2) using the identified name and a second computer program to search the database and to locate contact related information associated with the name, and

(3) inserting the contact related information into the document,

wherein steps (1)-(3) require only a single execute command.

**98**. A computer readable medium for assisting a computer operator to retrieve information from a database that is related to text in a document, the computer readable medium including program instructions for performing the steps of:

(1) using a first computer program to analyze the document, without direction from the operator, to identify text in the document that can be used to search for related information,

(2) using a second computer program and the text identified in step (1) to search the database and to locate related information, and

(3) inserting the information located in step (2) into the document.

**99**. A system for information handling within a document operated on by a first application program, the system comprising:

means for identifying without user intervention or designation the first information that can be utilized in a second application program, the first information selected from a group consisting of a name and an address; and

means for responding to a user selection by performing an operation related to a second information, the second information associated with all or part of the first information from the second application program, wherein the means for responding to the user selection further comprises:

means for initializing the second application program;

means for searching, using the second application program, for the second information associated with the first information; and

if said second information exists, means for retrieving and displaying the second information;

wherein said user selection comprises:

selecting a menu indicator for the menu;

opening the menu;

selecting a choice in the menu; and

activating the selected choice in the menu;

wherein selection the menu indicator comprises moving the mouse pointer to the menu indicator;

wherein the opening of a menu comprises clicking on the menu indicator with a mouse button; and

wherein the second information is associated with at least part of the identified first information.

**100**. A system for assisting a computer operator to retrieve contact related information from a database when a document includes a name, the system comprising:

(1) means for using a first computer program to analyze the document, without direction from the operator, to identify the name,

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 27

US 7,496,854 B2

**19**

(2) means for using the identified name and a second computer program to search the database and to locate contact related information associated with the name, and

(3) means for inserting the contact related information into the document,

wherein (1)-(3) require only a single execute command.

**101**. A system for assisting a computer operator to retrieve information from a database that is related to text in a document, the system comprising:

**20**

(1) means for using a first computer program to analyze the document, without direction from the operator, to identify text in the document that can be used to search for related information,

(2) means for using a second computer program and the text identified in (1) to search the database and to locate related information, and

(3) means for inserting the information located in (2) into the document.

\* \* \* \* \*

Apple Inc., Google Inc. and Motorola Mobility LLC
Exhibit 1001 - Page 28

# United States Court of Appeals
# for the Federal Circuit

*Arendi S.A.R.L. v. Apple Inc.*, No. 2015-2069, -2070, -2071

## <u>CERTIFICATE OF SERVICE</u>

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by SUNSTEIN KANN MURPHY & TIMBERS LLP, counsel for Appellant to print this document.  I am an employee of Counsel Press.

On **November 24, 2015** counsel has authorized me to electronically file the foregoing **BRIEF OF THE APPELLANT ARENDI S.A.R.L.** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

DAVID L. FEHRMAN
(*Principal Counsel*)
dfehrman@mofo.com
MEHRAN ARJOMAND
marjomand@mofo.com
ALEX S. YAP
ayap@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Blvd., Suite 6000
Los Angeles, CA 90017-3543
Tel: (213) 892-5200
Fax: (213) 892-5454
COUNSEL FOR APPELLEE,
APPLE, INC.

MATTHEW A. SMITH
(*Principal Counsel*)
smith@turnerboyd.com
ROBERT J. KENT
kent@turnerboyd.com
TURNER BOYD LLP
702 Marshall Street, Suite 640
Marshall City, CA 94063
Tel: (650) 521-5930
Fax: (650) 521-5931
COUNSEL FOR APPELLEES
MOTOROLA MOBILITY, LLC and
GOOGLE, INC

BRIAN R. MATSUI
bmatsui@mofo.com
SETH W. LLOYD
slloyd@mofo.com
JOSPEH R. PALMORE
JPalmore@mofo.com
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006-1888
P 202-887-6946
F 202-887-0763
COUNSEL FOR APPELLEE,
APPLE, INC.

Paper copies will also be mailed to the above principal counsel at the time paper

copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will

be filed with the Court within the time provided in the Court's rules.

November 24, 2015                              /s/ Robyn Cocho
                                               Counsel Press

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

<u>X</u>     The brief contains <u>13,570 </u>words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

__     The brief uses a monospaced typeface and contains ____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B) (iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

<u>X</u>     The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2013</u> in a <u>14</u> point <u>Times New Roman</u> font or

__     The brief has been prepared in a monospaced typeface using _____ in a ___ characters per inch _____ font.

November 24, 2015              <u>/s/Bruce D. Sunstein</u>
Date                          Name: Bruce D. Sunstein

                              Counsel for Appellant
                              Arendi S.A.R.L.